ALEXANDER *v.* LOUISIANA

No. 70–5026. Argued December 6–7, 1971—
Decided April 3, 1972

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, MARSHALL, and BLACKMUN, JJ., joined, and in Part I of which DOUGLAS, J., joined. DOUGLAS, J., filed a concurring opinion, *post*, p. 634. POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Charles Stephen Ralston* argued the cause for petitioner. With him on the brief were *Jack Greenberg, James M. Nabrit III, Margrett Ford,* and *Charles Finley.*

*Bertrand DeBlanc* argued the cause for respondent. With him on the brief were *Jack P. F. Gremillion,* Attorney General of Louisiana, *Harry Howard,* Assistant Attorney General, and *Charles R. Sonnier.*

*Birch Bayh* filed a brief for the National Federation of Business and Professional Women's Clubs, Inc., as *amicus curiae* urging reversal.

MR. JUSTICE WHITE delivered the opinion of the Court.

After a jury trial in the District Court for the Fifteenth Judicial District of Lafayette Parish, Louisiana, petitioner, a Negro, was convicted of rape and sentenced to life imprisonment. His conviction was affirmed on appeal by the Louisiana Supreme Court,[1] and this Court granted certiorari.[2] Prior to trial, petitioner had moved to quash the indictment because (1) Negro citizens were included on the grand jury list and venire in only token numbers, and (2) female citizens were systematically excluded from the grand jury list, venire, and impaneled grand jury.[3] Petitioner therefore argued that the indictment against him was invalid because it was returned by a grand jury impaneled from a venire made up con-

---

[1] 255 La. 941, 233 So. 2d 891 (1970). Petitioner was indicted for aggravated rape, and a 12-member jury unanimously returned a verdict of "Guilty without Capital Punishment."

[2] 401 U. S. 936 (1971).

[3] Petitioner does not here challenge the composition of the petit jury that convicted him. The principles that apply to the systematic exclusion of potential jurors on the ground of race are essentially the same for grand juries and for petit juries, however. *Pierre* v. *Louisiana,* 306 U. S. 354, 358 (1939). See generally *Neal* v. *Delaware,* 103 U. S. 370 (1881).

trary to the requirements of the Equal Protection Clause
and the Due Process Clause of the Fourteenth Amend-
ment. Petitioner's motions were denied.

According to 1960 U. S. census figures admitted into
evidence below, Lafayette Parish contained 44,986 per-
sons over 21 years of age and therefore presumptively
eligible for grand jury service;[4] of this total, 9,473
persons (21.06%) were Negro.[5] At the hearing on peti-
tioner's motions to quash the indictment, the evidence
revealed that the Lafayette Parish jury commission con-
sisted of five members, all of whom were white, who had
been appointed by the court. The commission compiled
a list of names from various sources (telephone directory,
city directory, voter registration rolls, lists prepared by
the school board, and by the jury commissioners them-
selves) and sent questionnaires to the persons on this list
to determine those qualified for grand jury service. The
questionnaire included a space to indicate the race
of the recipient. Through this process, 7,374 question-
naires were returned, 1,015 of which (13.76%) were from
Negroes,[6] and the jury commissioners attached to each

---

[4] The general qualifications for jurors set by Louisiana law are
that a person must be a citizen of the United States and of Louisiana
who has resided in the parish for at least a year prior to jury serv-
ice, be at least 21 years old, be able to read, write, and speak the
English language, "[n]ot be under interdiction, or incapable of serving
as a juror because of a mental or physical infirmity," and "[n]ot be
under indictment for a felony, nor have been convicted of a felony
for which he has not been pardoned." La. Code Crim. Proc., Art.
401 (1967).

[5] Testimony at the hearing on the motion to quash the indict-
ment also revealed that there were 40,896 registered voters in the
parish. Of this total, 17,803 were white males, and 16,483 were
white females; 3,573 were Negro males, and 3,037 were Negro fe-
males. App. 38.

[6] One hundred and eighty-nine questionnaires had no racial desig-
nation. App. 15.

questionnaire an information card designating, among other things, the race of the person, and a white slip indicating simply the name and address of the person. The commissioners then culled out about 5,000 questionnaires, ostensibly on the ground that these persons were not qualified for grand jury service or were exempted under state law. The remaining 2,000 sets of papers were placed on a table, and the papers of 400 persons were selected, purportedly at random, and placed in a box from which the grand jury panels of 20 for Lafayette Parish were drawn. Twenty-seven of the persons thus selected were Negro (6.75%).[7] On petitioner's grand jury venire, one of the 20 persons drawn was Negro (5%), but none of the 12 persons on the grand jury that indicted him, drawn from this 20, was Negro.

## I

For over 90 years, it has been established that a criminal conviction of a Negro cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which Negroes were excluded by reason of their race. *Strauder* v. *West Virginia,* 100 U. S. 303 (1880); *Neal* v. *Delaware,* 103 U. S. 370 (1881). Although a defendant has no right to demand that members of his race be included on the grand jury that indicts him, *Virginia* v. *Rives,* 100 U. S. 313 (1880), he is entitled to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the admin-

---

[7] There are some inconsistencies in the record as to the total number of Negroes in this group. The State introduced a certification by the clerk of the court stating that there were 25 Negroes and four persons with no race shown. App. 15. A count of the actual list of jurors, however, shows 27 Negroes and five persons with no race shown. App. 16–24.

istration of justice.[8] *Ex parte Virginia,* 100 U. S. 339 (1880); *Gibson* v. *Mississippi,* 162 U. S. 565 (1896). Cf. *Hernandez* v. *Texas,* 347 U. S. 475 (1954). It is only the application of these settled principles that is at issue here.

This is not a case where it is claimed that there have been no Negroes called for service within the last 30 years, *Patton* v. *Mississippi,* 332 U. S. 463, 464 (1947); only one Negro chosen within the last 40 years, *Pierre* v. *Louisiana,* 306 U. S. 354, 359 (1939); or no Negroes selected "within the memory of witnesses who had lived [in the area] all their lives," *Norris* v. *Alabama,* 294 U. S. 587, 591 (1935). Rather, petitioner argues that, in his case, there has been a consistent process of progressive and disproportionate reduction of the number of Negroes eligible to serve on the grand jury at each stage of the selection process until ultimately an all-white grand jury was selected to indict him.

In Lafayette Parish, 21% of the population was Negro and 21 or over, therefore presumptively eligible for grand jury service. Use of questionnaires by the jury commissioners created a pool of possible grand jurors which was 14% Negro, a reduction by one-third of possible black grand jurors. The commissioners then twice culled this group to create a list of 400 prospective jurors, 7% of whom were Negro—a further reduction by one-half.

---

[8] Section 4 of the 1875 Civil Rights Act, 18 Stat. 336, now codified as 18 U. S. C. § 243, affirms and reinforces this constitutional right: "No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000."

The percentage dropped to 5% on petitioner's grand jury venire and to zero on the grand jury that actually indicted him. Against this background, petitioner argues that the substantial disparity between the proportion of blacks chosen for jury duty and the proportion of blacks in the eligible population raises a strong inference that racial discrimination and not chance has produced this result because elementary principles of probability make it extremely unlikely that a random selection process would, at each stage, have so consistently reduced the number of Negroes.[9]

This Court has never announced mathematical standards for the demonstration of "systematic" exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors. The progressive decimation of potential Negro grand jurors is indeed striking here, but we do not rest our conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for the selection procedures themselves were not racially neutral. The racial designation on both the questionnaire and the information card provided a clear and easy opportunity for racial discrimination. At two crucial steps in the selection process, when the number of returned questionnaires was reduced to 2,000 and when the final selection of the 400 names was made, these racial identifications were visible on the forms used by the jury commissioners, although there is no evidence that the commissioners consciously selected by race. The situa-

_____

[9] We take note, as we did in *Whitus v. Georgia,* 385 U. S. 545, 552 n. 2 (1967), of petitioner's demonstration that under one statistical technique of calculating probability, the chances that 27 Negroes would have been selected at random for the 400-member final jury list, when 1,015 out of the 7,374 questionnaires returned were from Negroes, are one in 20,000. Brief for Petitioner 18 n. 18.

tion here is thus similar to *Avery* v. *Georgia*, 345 U. S. 559 (1953), where the Court sustained a challenge to an array of petit jurors in which the names of prospective jurors had been selected from segregated tax lists. Juror cards were prepared from these lists, yellow cards being used for Negro citizens and white cards for whites. Cards were drawn by a judge, and there was no evidence of specific discrimination. The Court held that such evidence was unnecessary, however, given the fact that no Negroes had appeared on the final jury: "Obviously that practice makes it easier for those to discriminate who are of a mind to discriminate." 345 U. S., at 562. Again, in *Whitus* v. *Georgia*, 385 U. S. 545 (1967), the Court reversed the conviction of a defendant who had been tried before an all-white petit jury. Jurors had been selected from a one-volume tax digest divided into separate sections of Negroes and whites; black taxpayers also had a "(c)" after their names as required by Georgia law at the time. The jury commissioners testified that they were not aware of the "(c)" appearing after the names of the Negro taxpayers; that they had never included or excluded anyone because of race; that they had placed on the jury list only those persons whom they knew personally; and that the jury list they compiled had had no designation of race on it. The county from which jury selection was made was 42% Negro, and 27% of the county's taxpayers were Negro. Of the 33 persons drawn for the grand jury panel, three (9%) were Negro, while on the 19-member grand jury only one was Negro; on the 90-man venire from which the petit jury was selected, there were seven Negroes (8%), but no Negroes appeared on the actual jury that tried petitioner. The Court held that this combination of factors constituted a prima facie case of discrimination, and a similar conclusion is mandated in the present case.

Once a prima facie case of invidious discrimination is

established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result. *Turner* v. *Fouche,* 396 U. S. 346, 361 (1970); *Eubanks* v. *Louisiana,* 356 U. S. 584, 587 (1958). The State has not carried this burden in this case; it has not adequately explained the elimination of Negroes during the process of selecting the grand jury that indicted petitioner. As in *Whitus* v. *Georgia, supra,* the clerk of the court, who was also a member of the jury commission, testified that no consideration was given to race during the selection procedure. App. 34. The Court has squarely held, however, that affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion. *Turner* v. *Fouche, supra,* at 361; *Jones* v. *Georgia,* 389 U. S. 24, 25 (1967); *Sims* v. *Georgia,* 389 U. S. 404, 407 (1967). "The result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner." *Hernandez* v. *Texas,* 347 U. S., at 482. See also *Norris* v. *Alabama,* 294 U. S., at 598. The clerk's testimony that the mailing list for questionnaires was compiled from nonracial sources is not, in itself, adequate to meet the State's burden of proof, for the opportunity to discriminate was presented at later stages in the process. The commissioners, in any event, had a duty "not to pursue a course of conduct in the administration of their office which would operate to discriminate in the selection of jurors on racial grounds." *Hill* v. *Texas,* 316 U. S. 400, 404 (1942). See also *Smith* v. *Texas,* 311 U. S. 128, 130 (1940). Cf. *Carter* v. *Jury Commission,* 396 U. S. 320, 330 (1970). We conclude, therefore, that "the opportunity for discrimination was present and [that it cannot be said] on this record that it was not resorted to by the commissioners." *Whitus* v. *Georgia, supra,* at 552.

## II

Petitioner also challenges the Louisiana statutory exemption of women who do not volunteer for grand jury service. Article 402, La. Code Crim. Proc. This claim is novel in this Court and, when urged by a male, finds no support in our past cases. The strong constitutional and statutory policy against racial discrimination has permitted Negro defendants in criminal cases to challenge the systematic exclusion of Negroes from the grand juries that indicted them. Also, those groups arbitrarily excluded from grand or petit jury service are themselves afforded an appropriate remedy. Cf. *Carter* v. *Jury Commission, supra.* But there is nothing in past adjudications suggesting that petitioner himself has been denied equal protection by the alleged exclusion of women from grand jury service. Although the Due Process Clause guarantees petitioner a fair trial, it does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury. In *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), the Court held that because trial by jury in criminal cases under the Sixth Amendment is "fundamental to the American scheme of justice," *id.,* at 149, such a right was guaranteed to defendants in state courts by the Fourteenth Amendment, but the Court has never held that federal concepts of a "grand jury," binding on the federal courts under the Fifth Amendment, are obligatory for the States. *Hurtado* v. *California,* 110 U. S. 516, 538 (1884).

Against this background and because petitioner's conviction has been set aside on other grounds, we follow our usual custom of avoiding decision of constitutional issues unnecessary to the decision of the case before us. *Burton* v. *United States,* 196 U. S. 283, 295 (1905). See *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 346–348 (1936) (Brandeis, J., concurring). The

State may or may not recharge petitioner, a properly constituted grand jury may or may not return another indictment, and petitioner may or may not be convicted again. See *Ballard* v. *United States,* 329 U. S. 187, 196 (1946).

*Reversed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.

While I join Part I of the Court's opinion, I am convinced we should also reach the constitutionality of Louisiana's exclusion of women from jury service. The issue is squarely presented, it has been thoroughly briefed and argued, and it is of recurring importance. The Court purports to follow "our usual custom" of avoiding unnecessary constitutional issues. But that cannot be the sole rationale, for both questions are of constitutional dimension. We could just as well say that deciding the constitutionality of excluding women from juries renders it unnecessary to reach the question of racial exclusion.

It can be argued that the racial exclusion admits of the "easier" analysis. But this Court does not sit to decide only "easy" questions. And even when faced with "hard" constitutional questions, we have often decided cases on alternate grounds where a decision on only one would have been dispositive. See, *e. g., Dunn* v. *Blumstein, ante,* p. 330.

Petitioner complains of the exclusion of blacks and women from the grand jury which indicted him. Conceivably, he could have also complained of the exclusion of several other minority groups. Would he then be relegated to suffer repetitive re-indictment and re-conviction while this court considered the exclusion of each group in a separate lawsuit?

I believe the time has come to reject the dictum in *Strauder* v. *West Virginia,* 100 U. S. 303, 310, that a State "may confine" jury service "to males." I would here reach the question we reserved in *Hoyt* v. *Florida,* 368 U. S. 57, 60, and hold that Art. 402, La. Code Crim. Proc.,[1] as applied to exclude women as a class from Lafayette Parish jury rolls, violated petitioner Alexander's constitutional right to an impartial jury drawn from a group representative of a cross-section of the community.[2]

It is irrelevant to our analysis that Alexander attacks the composition of the grand jury that indicted him, not the petit jury which convicted him, for it is clear that a State which has a grand jury procedure must administer that system consonantly with the Federal Constitution. The Court asserts, however, that "federal concepts" of a grand jury do not obligate the States, and cites *Hurtado* v. *California,* 110 U. S. 516, 538. *Ante,* at 633. But *Hurtado* supports no such proposition. That case merely held that the Fifth Amendment grand jury requirement was not binding on the States. It said nothing as to the constitutional requirements which obtain once a State chooses to provide a grand jury, and we are directed to no other case which does speak to the subject. But this Court has said time and again, regardless of a State's freedom to reject the federal grand jury, and to reject even the petit jury for offenses punishable by less than six months' imprisonment, *Baldwin* v. *New York,* 399 U. S. 66, "Once the State chooses to provide grand

---

[1] Article 402, La. Code Crim. Proc.: "A woman shall not be selected for jury service unless she has previously filed with the clerk of court of the parish in which she resides a written declaration of her desire to be subject to jury service."

[2] The fact that Alexander is a male challenging the exclusion of females from the jury rolls is not of significance, for his claim rests, not on equal protection principles, but on the right of any defendant to an impartial jury, no matter what his sex or race.

and petit juries, whether or not constitutionally required to do so, it must hew to federal constitutional criteria . . . ." *Carter* v. *Jury Commission*, 396 U. S. 320, 330.[3]

It is furthermore clear that just such a "federal constitutional criteri[on]" is that the grand jury, just as the petit jury, must be drawn from a representative cross-section of the community. The Court was speaking of both grand and petit juries in *Carter* v. *Jury Commission, supra*, when, quoting *Smith* v. *Texas*, 311 U. S. 128, 130, it *defined* the jury as "a body truly representative of the community." 396 U. S., at 330. The Court was speaking of grand and petit juries when it said in *Brown* v. *Allen*, 344 U. S. 443, 474: "Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, *so long as the source reasonably reflects a cross-section of the population* suitable in character and intelligence for that civic duty." (Emphasis supplied.) As Mr. Justice Black said, speaking for the Court in *Pierre* v. *Louisiana*, 306 U. S. 354, 358: "Indictment by Grand Jury and trial by jury cease to harmonize with our traditional concepts of justice at the very moment particular groups, classes or races . . . are excluded as such from jury service." (Footnote omitted.)

The requirement that a jury reflect a cross-section of the community occurs throughout our jurisprudence: "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, neces-

---

[3] While *Carter* arose under the Equal Protection Clause, and concerned the right of prospective jurors excluded from the venire solely by reason of their race, the analysis is the same in the instant case, where the question is the accused's right to an impartial jury. *Turner* v. *Louisiana*, 379 U. S. 466.

sarily contemplates an impartial jury drawn from a cross-section of the community. *Smith* v. *Texas,* 311 U. S. 128, 130; *Glasser* v. *United States,* 315 U. S. 60, 85." *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 220. Accord, *Williams* v. *Florida,* 399 U. S. 78, 100; *Witherspoon* v. *Illinois,* 391 U. S. 510, 520; *Ballard* v. *United States,* 329 U. S. 187, 192–193; *Labat* v. *Bennett,* 365 F. 2d 698, 722–724.[4]

This is precisely the constitutional infirmity of the Louisiana statute. For a jury list from which women have been systematically excluded is not representative of the community.

> "It is said, however, that an all male panel drawn from the various groups within a community will be as truly representative as if women were included. The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—and not sex. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But, if the shoe were on the other foot, who would claim

[4] The cases most precisely articulating the requirement that a jury reflect a cross section of the community arose under our supervisory power over the federal courts. See, *e. g., Ballard* v. *United States,* 329 U. S. 187; *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217; *Glasser* v. *United States,* 315 U. S. 60. The detail with which these cases were written, however, simply reflects our obligation to provide guidelines for the federal system. It is consistent with our principle of federalism that the States be permitted greater latitude in fashioning their jury-selection procedures, but to avoid constitutional infirmity the result must be designed to produce a representative cross section of the community. *Brown* v. *Allen,* 344 U. S. 443, 474; *Carter* v. *Jury Commission,* 396 U. S. 320, 322, 333.

that a jury was truly representative of the com-
munity if all men were intentionally and systemati-
cally excluded from the panel? The truth is that
the two sexes are not fungible; a community made
up exclusively of one is different from a community
composed of both; the subtle interplay of influence
one on the other is among the imponderables. To
insulate the courtroom from either may not in a
given case make an iota of difference. Yet a flavor,
a distinct quality is lost if either sex is excluded.
*The exclusion of one may indeed make the jury
less representative of the community than would be
true if an economic or racial group were excluded."*
*Ballard* v. *United States, supra,* at 193–194. (Em-
phasis supplied; footnotes omitted.)

The record before us, moreover, indisputably reveals
that such a systematic exclusion operated with respect
to the Lafayette Parish jury lists. There were no women
on the grand jury that indicted petitioner, and there
were no women on the venire from which the jury was
chosen. While the venire was selected from returns to
questionnaires sent to parish residents, not a single one
of the some 11,000 questionnaires was even sent to a
woman. This was done deliberately.[5]

---

[5] Mr. LeBlanc, clerk of the court in Lafayette Parish, and a mem-
ber of the parish jury commission, testified as to the process by which
the venire was chosen at the hearing on the motion to quash
Alexander's indictment:

"A. The slips or list that are put in the general venire box are
made from questionnaires that I mailed out.

. . . . .

"Q. Now, who is this questionnaire sent to? How is that
determined?

"A. To the different people in the Parish by the registrar of voter's
list and the telephone book, city directory, different lists that are

The State relies on the fact that the automatic exemption it grants to women is the same as the one upheld in *Hoyt* v. *Florida,* 368 U. S. 57. In *Hoyt,* however, there were women on the jury rolls, and the jury commissioners had made good-faith efforts to include women on the jury lists despite the fact that they had an automatic exemption unless they volunteered for service. *Id.,* at 69 (Warren, C. J., concurring). Here, on the other hand, only the feeblest efforts were made to interest women in service,[6] and there was testimony that only a single woman had filled out a jury service questionnaire.[7] This, out of a parish population of 45,000 adults, 52% of whom were female.

The absolute exemption provided by Louisiana, and no other State,[8] betrays a view of a woman's role which

---

submitted by school board or any list that we can find that we think we got address [*sic*] for the mixed race one way or the other.

. . . . .

"Q. Was the questionnaire mailed to any women at all?

"A. We have received some that was filled in by some ladies. I think one.

"Q. Did you mail any to any women intentionally or did you intentionally exclude women when you mailed them?

"A. We didn't mail any to the women." App. 35, 53.

[6] The only evidence in the record that any effort whatsoever was expended to encourage women to volunteer for jury service was a statement by Mr. LeBlanc that he had "discussed that with the Assistant District Attorney," and that he had "sent her at [*sic*] different women's clubs to explain to the women the possibility of being on the jury." App. 54. He also averred that "we're working on the women to submit names and intention to serve." *Ibid.*

As indicated in n. 5, *supra,* however, these efforts produced but a single questionnaire from a woman. The 11,000 questionnaires sent to men, on the other hand, resulted in over 7,000 responses. App. 15.

[7] Testimony of Mr. LeBlanc. See nn. 5–6, *supra.*

[8] No State now prohibits women from service on juries altogether, Alabama's prohibition having been found unconstitutional in *White*

cannot withstand scrutiny under modern standards. We once upheld the constitutionality of a state law denying to women the right to practice law, solely on grounds of sex. *Bradwell* v. *State,* 16 Wall. 130. The rationale underlying Art. 402 of the Louisiana Code is the same as that which was articulated by Justice Bradley in *Bradwell:*

> "Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. . . .
>
> ". . . The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator. And the rules of civil society must be adapted to the general constitution of things, and cannot be based upon exceptional cases." *Id.,* at 141–142.

v. *Crook,* 251 F. Supp. 401 (MD Ala. 1966). Most States afford equal treatment to men and women, although exemptions are frequently provided for women who are pregnant or who have children under 18 at home. Five States now allow women an absolute exemption, based solely on their sex, but they must affirmatively request it. Ga. Code Ann. § 59–124 (1965); Mo. Const., Art. I, § 22 (b); N. Y. Judiciary Law § 507 (7) (1968); R. I. Gen. Laws Ann. § 9–9–11 (1970); Tenn. Code Ann. § 22–101, § 22–108 (1955).

Classifications based on sex are no longer insulated from judicial scrutiny by a legislative judgment that "woman's place is in the home," or that woman is by her "nature" ill-suited for a particular task. See, *e. g.*, *Reed* v. *Reed,* 404 U. S. 71. But such a judgment is precisely that which underpins the absolute exemption from jury service at issue.[9] Insofar as *Hoyt, supra,*

---

[9] Perhaps the purest articulation of the objection to woman jury service is that of Judge Turner, dissenting in *Rosencrantz* v. *Territory,* 2 Wash. Ter. 267, 5 P. 305 (1884), a case in which a female defendant challenged the grand jury which indicted her on the ground that it *included* married women living with their husbands. The challenge was rejected over Judge Turner's dissent:

"It is said that the rights of the weaker sex, if I may now call them so, are more regarded than in the days of Blackstone; and that the theory of that day, that women were unfitted by physical constitution and mental characteristics to assume and perform the civil and political duties and obligations of citizenship, has been exploded by the advanced ideas of the nineteenth century. This may be true. No man honors the sex more than I. None has witnessed more cheerfully the improvement in the laws of the States, and particularly in the laws of this Territory, whereby many of the disabilities of that day are removed from them, and their just personal and property rights put upon an equal footing with those of men. I cannot say, however, that I wish to see them perform the duties of jurors. The liability to perform jury duty is an obligation, not a right. In the case of woman, it is not necessary that she should accept the obligation to secure or maintain her rights. If it were, I should stifle all expression of the repugnance that I feel at seeing her introduced into associations and exposed to influences which, however others regard it, must, in my opinion, shock and blunt those fine sensibilities, the possession of which is her chiefest charm, and the protection of which, under the religion and laws of all countries, civilized or semi-civilized, is her most sacred right.

"If one woman is competent as a juror, all women having the same qualifications are competent. If women may try one case, they may try all cases. It is unnecessary to say more, to suggest the shocking possibilities to which our wives, mothers, sisters, and

642

embodies this discredited stereotype, it should be firmly disapproved.[10] See Johnston & Knapp, Sex Discrimination by Law: A Study in Judicial Perspective, 46 N. Y. U. L. Rev. 675, 708–721 (1971).

daughters may be exposed . . . . These observations, however, are not pertinent here. The question is, What is the law?

"I say, that the laws now concerning the important incidents of a jury trial are, by express constitutional provision, what they were at the common law, and that under that law a jury was no jury unless it was composed of men." *Id.*, at 278–279, 5 P., at 309–310.

[10] In *Fay* v. *New York*, 332 U. S, 261, there is also a dictum approving the constitutionality of excluding women from jury service. Relying solely on the proposition that: "Until recently, and for nearly a half-century after the Fourteenth Amendment was adopted, it was universal practice in the United States to allow only men to sit on juries," the Court opined that "woman jury service has not so become a part of the textual or customary law of the land that one convicted of crime must be set free by this Court if his state has lagged behind what we personally may regard as the most desirable practice in recognizing the rights and obligations of womanhood." *Id.*, at 289–290. This dictum was totally irrelevant to the holding in *Fay*, approving New York's special "blue-ribbon" jury system, for the Court stated flatly that: "The evidence does not show that women are excluded from the special jury." *Id.*, at 278. Indeed, there were women on the very jury which was at issue in the case. *Ibid.*

The "nose-counting" approach which led to the *Fay* Court's refusal to recognize woman jury service as "part of the textual or customary law of the land" has, of course, been thoroughly undermined by subsequent events. See n. 8, *supra.* It has been suggested that the decision itself was overruled by *Duncan* v. *Louisiana*, 391 U. S. 145. *Id.*, at 185 n. 25, and text following (Harlan, J., dissenting). And what little there may be left after *Duncan*, is, like *Strauder* v. *West Virginia*, 100 U. S. 303, and *Hoyt* v. *Florida*, 368 U. S. 57, based on an obsolete view of woman's role which does not square with reality. "[The *Fay*] dictum . . . calls to mind—in its total reliance on historical practice as justification for sex discrimination—the . . . observation . . . that attitudes can be more formidable than arguments." Johnston & Knapp, Sex

Louisiana says, however, that women are not totally excluded from service; they may volunteer. The State asserts it is impractical to require women affirmatively to claim the statutory exemption because of the large numbers who would do so. This argument misses the point. Neither man nor woman can be expected to volunteer for jury service. *Hoyt, supra,* at 64–65. See L. Kanowitz, Women and the Law 30 (1969). Thus, the automatic exemption, coupled with the failure even to apprise parish women of their right to volunteer, results in as total an exclusion as would obtain if women were not permitted to serve at all.

Some violations of due process of law may be excused in the context of a criminal trial, if the error cannot be shown to have had an effect on the outcome. See, *e. g., Giglio* v. *United States, ante,* p. 150; *Napue* v. *Illinois,* 360 U. S. 264, 272. But the right to a representative jury is one which would be trivialized were a similar requirement imposed:

> "We can never measure accurately the prejudice that results from the exclusion of certain types of qualified people from a jury panel. Such prejudice is so subtle, so intangible, that it escapes the ordinary methods of proof. It may be absent in one case and present in another; it may gradually and silently erode the jury system before it becomes evident. But it is no less real or meaningful for our purposes. If the constitutional right to a jury impartially drawn from a cross-section of the community has been violated, we should vindicate

Discrimination by Law: A Study in Judicial Perspective, 46 N. Y. U. L. Rev. 675, 715 (1971). See *State* v. *Emery,* 224 N. C. 581, 601, 31 S. E. 2d 858, 871 (1944) (Seawell, J., dissenting). See also *Rosencrantz* v. *Territory, supra* (Turner, J., dissenting).

that right even though the effect of the violation has not yet put in a tangible appearance. Otherwise that right may be irretrievably lost in a welter of evidentiary rules." *Fay* v. *New York*, 332 U. S. 261, 300 (Murphy, J., dissenting).

A statutory procedure which has the effect of excluding all women does not produce a representative jury, and is therefore repugnant to our constitutional scheme. Cf. *White* v. *Crook*, 251 F. Supp. 401, 408–409 (MD Ala. 1966). For these reasons, I would hold Art. 402, La. Code Crim. Proc., to be unconstitutional.