I would grant the writ of certiorari in this case to review the judgment of the Court of Criminal Appeals and determine whether that Court's judgment is contrary to the holding of this Court in Ex parte Branch, 526 So.2d 609 (1987).
The facts are not difficult. The defendant is black. There were nine blacks on the venire. The State used seven of its nine peremptory strikes to eliminate blacks from the trial jury. The defendant struck one black, and one black served on the jury that convicted the defendant. The Court of Criminal Appeals set out the reasons given by the State for exercising its strikes as it did:
 "In response to the defense counsel's motion, the prosecutor gave the following explanations for his strikes: a young black female was struck because she was a homemaker and `may have trouble making the necessary judgments that have to be made and that is the knowledge of what life is like out on the street'; a young black female who is a student made no indication that she was working and `would have not have [sic] the necessary experience to be able to draw on to make a judgment in this case'; an older black female who was retired and `maybe overly sympathetic *Page 857 
based on the fact that she appeared to be a grandmotherly type'; a young black male who had a beard and `I [the prosecutor] tend to think that people that have beards are somehow those that try to go against the grain,' and also, `both of the defense attorneys have beards and I felt like that he would somehow identify with the defense attorneys and would therefore lean in their direction'; a middle-aged, black male who was not working and `may be somewhat irresponsible'; and a middle-aged black female who was some type of supervisor and appeared to be in the same age group as the defendants' parents or mothers."
The Court of Criminal Appeals determined that the reasons given by the State were "race-neutral explanations." I cannot agree that they were, as a matter of law.
In Branch, this Court spelled out in great detail some of the guidelines that trial courts must use in determining whether there has been a Batson violation.[1]
Applying the Branch guidelines, I think it is unquestioned that the defendant made out a prima facie case of the State's discriminatory use of its peremptory challenges. The only question is whether the record contains a sufficient showing of "race-neutral explanations" for the State's exercise of its peremptory strikes, as the Court of Criminal Appeals found. InBranch, this Court set out the rule of law that applies once a prima facie case is made:
 "After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. [79] at 97, 106 S.Ct. [1712] at 1723 [90 L.Ed.2d 69]. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. [Ex parte Jackson, 516 So.2d 768
(Ala. 1986); State v. Neil, 457 So.2d 481, at 487 (Fla. 1984); People v. Wheeler, 22 Cal.3d 258, at 281-82, 148 Cal.Rptr. 890, at 906, 583 P.2d 748, at 765 (1978).]
 "In addition to a clear, specific, and plausible nondiscriminatory explanation of a specific characteristic that affected the decision to challenge, the following are illustrative of the types of evidence that can be used to overcome the presumption of discrimination and show neutrality:
 "1. The state challenged non-black jurors with the same or similar characteristics as the black jurors who were struck.
 "2. There is no evidence of a pattern of strikes used to challenge black jurors; e.g., having a total of 6 peremptory challenges, the state used 2 to strike black jurors and 4 to strike white jurors, and there were blacks remaining on the venire.
 "Batson makes it clear, however, that `[t]he State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties. Rather, the State must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result."' Batson, 476 U.S. at 94, 106 S.Ct. at 1721, citing Alexander v. Louisiana, 405 U.S. 625, 632, [92 S.Ct. 1221, 1226, 31 L.Ed.2d 536] (1972). Furthermore, intuitive judgment or suspicion by the prosecutor is insufficient to rebut the presumption of discrimination. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. Finally, a prosecutor cannot overcome the presumption `merely by denying any discriminatory motive or "affirming his good faith in individual selections."' Batson, 476 U.S. at 98, 106 S.Ct. at 1723, *Page 858 
citing Alexander, 405 U.S. at 632 [92 S.Ct. at 1226).
 "Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext. Wheeler, 22 Cal.3d at 282, 583 P.2d at 763-64, 148 Cal.Rptr. at 906. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
 "1. The reasons given are not related to the facts of the case.
 "2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
 "3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck. Slappy, [v. State], 503 So.2d 350, at 354 [Fla. 3 DCA 1987]; [People v.] Turner, 42 Cal.3d [711] at 725, 726 P.2d [102] at 110, 230 Cal.Rptr. [656] at 664; Wheeler, 22 Cal.3d at 282, 583 P.2d at 760, 148 Cal.Rptr. at 906.
 "4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
 "5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire. Cf. Slappy, 503 So.2d, at 354; Turner, 42 Cal. 3d at 715, 726 P.2d at 103, 230 Cal.Rptr. at 657.
 "6. `[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.' Slappy, 503 So.2d, at 355. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.
 "The trial court, in exercising the duties imposed upon it, must give effect to the state policy expressed in Sections 1, 6, and 22 of the Alabama Constitution and Code 1975, § 12-16-55
and § 12-16-56. Furthermore, the trial judge must make a sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as he knows them, his knowledge of trial techniques, and his observation of the manner in which the prosecutor examined the venire and the challenged jurors. People v. Hall, 35 Cal.3d 161, 672 P.2d 854, 858, 197 Cal.Rptr. 71 (1983); see also Wheeler, 22 Cal. 3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 906."
The public policy of this State relating to the qualification and selection of juries is succinctly stated in Ala. Code 1975, as follows:
§ 12-16-55:
 "It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this
 state and an obligation to serve as jurors when summoned for that purpose. (Acts 1978, No. 594, p. 712, § 1.)"
§ 12-16-56:
 "A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin or economic status. (Acts 1978, No. 594, p. 712, § 2.)"
I am aware of the State's concern about the effects of theBranch decision on the trial of criminal cases. The district attorneys of the State, acting by and through the district attorneys' association, filed an amicus brief in connection with the State's application for rehearing in the Branch case. In that brief, they argued:
 "All lawyers who try cases know of the difficulty in picking a fair jury from a venire of jurors about whom the lawyers know very little. All trial lawyers are aware of the limits of voir dire questioning in eliciting a juror's feelings and biases on questions that go to the heart of how that juror will view a particular *Page 859 
case. Given this, all trial lawyers are forced to rely on common sense generalizations about jurors.
 "Legal periodicals are full of advice, by experienced lawyers and persons trained in psychology, on how to pick juries based on stereotyping of persons by religion, sex, income level, occupation, manner of dress, and so forth. See, e.g., Bailey and Rothblatt, Successful Techniques for Criminal Trials, §§ 6:44, 8:16 (1985); Lane, Goldstein Trial Technique, § 9.44-9.38 (3d Ed.Supp. 1986); Blinder, Picking Juries, 1 Trial Diplomacy Journal 8 (1978); Covington, State-of-the-Art in Jury Selection Techniques: More Science Than Luck, Trial, Vol. 19, No. 9, September 1983, p. 84. In addition, advice in jury picking based on such stereotyping is often handed out at continuing legal education seminars.
 "The Court's statements about group-based strikes have the effect of barring prosecutors not only from utilizing the vast literature on jury selection but from relying on their own experience and common sense about people in striking jurors. This simply works to render the trial process unfair to the state."
In their brief on application for rehearing, the district attorneys also argued:
 "To require a prosecutor to question a potential juror in accordance with Batson places an unreasonable burden on the state. A `magnifying glass' approach mandated on the district attorneys in voir dire examination in accordance with Branch is simply unworkable. The implementation of Branch
requirements would bring the criminal justice system to a virtual crawl with unreasonable technicalities present in every case. This would destroy the very essence of a speedy trial which is guaranteed by the Sixth Amendment of the United States Constitution. As Chief Justice Torbert pointed out in his concurring opinion, citing Justice Beatty: `[P]erhaps it will be necessary, as Justice Beatty suggests, to abandon the use of peremptory challenges if it turns out that as a practical matter the costs of dealing [with] that tension outweigh the benefits of the peremptory strikes. Those costs are the loss of precious judicial time and diversion of the judicial system from the resolution of cases.' (Branch, 526 So.2d at 631.)
 "Justice Marshall in the Batson decision said: `The decision today will not end the racial discrimination that peremptories inject into the jury selection process. That goal can be accomplished only by eliminating peremptory challenges entirely.' (Batson, 476 U.S. at 102-03, 106 S.Ct. at 1726). Justice Marshall readily admits that the trial courts face the difficult burden of assessing the prosecutor's motives. He questions the good faith of the prosecutor by stating that: `Any prosecutor can easily assert facially neutral reasons for striking a juror and the trial courts are ill-equipped to second-guess those reasons.' (Batson, 476 U.S. at 106, 106 S.Ct. at 1728). He, in effect, purports to resolve this problem by eliminating peremptory challenges entirely in criminal cases. The Alabama Supreme Court, based on the decision in Branch, would seem to further that objective. This case seems to take another step towards the elimination of peremptory challenges in criminal cases. Chief Justice Torbert in his concurring opinion asks the question, `How do we in practice enforce the rule of Batson, while retaining the use of peremptory challenges?' (Branch, 526 So.2d 631). The Branch
decision, in reality, seems to answer that we cannot do both."
I am acutely aware of the concerns by the district attorneys of this State, and I appreciate the concerns that members of this Court have expressed in dissenting and concurring opinions in Branch regarding the State's use of peremptory strikes. As author of the majority opinion in Branch, I believe that some of the fears expressed by those who disagree with Branch may not be justified. Even before the Branch decision was released, some courts had adopted procedures to meet the requirements of *Page 860 Batson,[2] and I believe that the bench and bar, working together, can operate under the Batson requirements without undue hardship.
In Batson, the Supreme Court of the United States stated that prosecuting attorneys could use voir dire examination to assist them in exercising their peremptory strikes in a nondiscriminatory manner. In Branch, this Court did not delineate the various methods the State might use to exercise its peremptory challenges in a nondiscriminatory manner, but the Court did not foreclose the use by the State of various means to ferret out information about particular jurors, such as voir dire examination, questionnaires, or studies showing that jurors who have certain traits tend to vote in certain ways. See, Frederick, "Jury Behavior: A Psychologist Examines Jury Selection," 5 Ohio N.U.L.Rev. 571 (1978). It is my opinion that a well-worded questionnaire, prepared by a professional, would be a helpful tool in determining particular juror attitudes, and that it could be used to substantiate the exercise of particular peremptory challenges in a particularcase. See Note: "Juror Bias — A Practical Screening Device and the Case for Permitting Its Use," 64 Minn.L.Rev. 987 (1980), which examines the "Legal Attitudes Questionnaire," which supposedly predicts which potential jurors would be most likely to harbor certain biases in a criminal case. The "Legal Attitudes Questionnaire" is included as an appendix to that note. The use of juror questionnaires is discussed in a recent volume of the American Journal of Trial Advocacy, published by Cumberland School of Law, see, "Voir Dire: A Trial Technique in Transition," 10 Am.J. Trial Advocacy 37 (1987), which is a reprint of an article appearing at 4 Am.J. Trial Advocacy 522 (1981).
While the use of "body language" or nonverbal communications are not forbidden by Branch, the use of nonverbal communication, or any nonspecific juror profile, should be approached with care, and, if used, should be used only in anondiscriminatory manner.
I cannot say absolutely that the State failed to follow theBranch guidelines in this case, but I can say, based on the statement of facts in the opinion of the Court of Criminal Appeals, that it would appear that the State exercised its peremptory strikes with little or no voir dire and that the State did not follow the guidelines of Branch; therefore, I would grant the writ and remand the cause to the Court of Criminal Appeals, with directions, as this Court did in Branch.
Consequently, I must respectfully dissent.
JONES and ADAMS, JJ., concur.
[1] This case was tried before the Branch case was decided, and the original opinion of the Court of Criminal Appeals was released before this Court released Branch. Consequently, the trial court and the Court of Criminal Appeals did not have theBranch guidelines before them. Because of that fact, I would grant the writ in this case and remand the case to the Court of Criminal Appeals, with directions, as this Court did in Branch.
[2] After the release of the opinion in Branch, I received a letter from a trial judge in the 10th Judicial Circuit, who enclosed a copy of a procedure that circuit had adopted to handle the Batson problem:
"MINUTES
"Circuit Criminal Judges' Meeting
 "June 25, 1986 "4:30 p.m. "Judge Jasper's Courtroom
 "All judges thoroughly discussed the Batson v. Kentucky . . . case. Following a thorough discussion by all judges, the following policy was decided:
 "POLICY TO BE IMPLEMENTED BY THE TENTH JUDICIAL CIRCUIT CRIMINAL DIVISION FOR THE IMPLEMENTATION OF BATSON V. KENTUCKY
 "Juries will be impanelled according to law in all cases being tried in the Criminal Division of the Tenth Judicial Circuit. At the conclusion of all strikes (with all veniremen in place), if there is a side bar Batson objection, the Court will retire to chambers with the district attorney, defense attorney, defendant and court reporter.
 "Upon a prima facie showing of a Batson objection, the Court will require the district attorney to articulate reasons as per Batson.
 "The Court will review the reasons. Should the Court sustain the objections, the struck juror/jurors will be reinstated and the state will be afforded strikes to replace those jurors who have been reinstated. The alternate strikes shall be made while the group is assembled in judge's chambers." *Page 861