503 S.E.2d 168

**The STATE, Respondent,**

v.

**Ricky GEORGE, Appellant.**

No. 24824.

Supreme Court of South Carolina.

Heard May 12, 1998.

Decided July 27, 1998.

Rehearing Denied Aug. 27, 1998.

Senior Assistant Appellate Defender Wanda H. Haile, of South Carolina Office of Appellate Defense, Columbia; and William Isaac Diggs, Myrtle Beach, for appellant.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Columbia; and Solicitor Ralph J. Wilson, Conway, for respondent.

TOAL, Justice:

Ricky George appeals from an order rejecting his claim of an equal protection violation based on systematic exclusion of African Americans in the Horry County grand jury selection process. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

George was charged and convicted of murder, conspiracy to commit murder, and armed robbery. He was sentenced to death. In *State v. George*, 323 S.C. 496, 476 S.E.2d 903 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1261, 137 L.Ed.2d 340 (1997), we affirmed George's conviction and sentence, but remanded the matter for an inquiry about one issue, namely, George's allegation that the indictment in the case was issued by a grand jury from which African Americans had been excluded. On appeal, we observed that although the record contained no statistical evidence to support George's claim that African Americans had been systematically or deliberately excluded, it did appear that they were underrepresented on the grand jury in this matter. Because the trial court had denied George's request for a separate hearing to present data pertaining to the disqualification of individual grand jurors in Horry County, we concluded that George was denied the opportunity, as outlined in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), to provide statistics comparing the proportion of African Americans in Horry County to the proportion called to serve as grand jurors.

Accordingly, the matter was remanded to the circuit court to carry out a factual inquiry about this issue, pursuant to the standard enunciated in *Castaneda*. After remand, a hearing was conducted where evidence was presented on whether African Americans had been systematically excluded from the Horry County grand jury. The circuit court subsequently issued an order finding there had been no discriminatory exclusion of African Americans. George appeals that order.

### LAW/ANALYSIS

■ George argues the circuit court erred in finding that no systematic discrimination against African Americans existed within the Horry County grand jury selection process. We disagree.

George notes that his indictment was handed down by a grand jury that included no African Americans. Additionally, no African Americans sat on Horry County's grand jury for the period 1991–93. George's expert, Dr. Albiniak, testified that the probability of this occurring was 1 in 5,000. Further, George asserts that although African Americans represented 13% of Horry County's population, only 7.5% of those summoned for grand jury service during the 1991–96 period were African Americans. Based on this statistical information, George argues that the circuit court erred in finding no systematic exclusion.

In *Castaneda*, the United States Supreme Court outlined the following test to be utilized when a defendant makes a grand jury discrimination claim:

> [I]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must˙show that the procedure employed resulted in substantial under-representation of his race or of the identifiable group to which he belongs. The *first* step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Next*, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. ... *Finally*, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

*Castaneda*, 430 U.S. at 494–95, 97 S.Ct. at 1280, 51 L.Ed.2d at 510–11 (citations omitted) (emphasis added).

Under the *Castaneda* test, it is undisputed that George satisfied the first element of belonging to a group that is a recognizable, distinct class. The second element of the *Castaneda* test is that the degree of underrepresentation must be proved by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors,

over a significant period of time. Because Castaneda requires analysis of underrepresentation over "a significant period of time," we must conduct our examination based not on the 1991–93 figures, but rather the 1991–96 figures.

At first blush the statistical data mentioned above may raise the specter of underrepresentation; however, a closer examination reveals that George's statistical figures are seriously flawed. There are three major problems with George's statistical argument. First, George's statistical comparisons are based on an incorrect base figure. As indicated above, George asserts that although African Americans represented 13% of Horry County's population, only 7.5% of those summoned for grand jury service during the 1991–96 period were African Americans. The problem with this argument is that the 13% figure is not the percentage of Horry County's African American population that was eligible for jury duty, but rather the percentage of African Americans who were registered to vote. The manner in which grand juries are selected in South Carolina is as follows:

> Each county receives a list of individuals who reside within that county, who are over eighteen years of age, who hold a South Carolina driver's license or identification card, and who are United States citizens. This list is merged with the county list of registered voters to establish the roll of eligible jurors for that county.

*George*, 323 S.C. at 506, 476 S.E.2d at 909 (citing S.C.Code Ann. § 14–7–130 (Supp.1995)). In his statistical argument, George's expert witness based his calculations on a 13% figure that constituted just the voter registration pool, not the potential jury pool.[1] In other words, the figure did not take into account the statutory requirement of both the voter registration list and the driver's license/identification card list. At the hearing, the circuit court raised this question, but the question was not adequately addressed by the parties. Because the base figure was incomplete and did not conform to the statuto-

---

1. We note that the circuit court's order incorrectly refers to Dr. Albiniak's testimony concerning African Americans making up more than 13% of the "voting and driving population." This statement—that the percentage was based on voting *and* driving population—is directly contradicted by the record, so we assume this was a scrivener's error.

ry requirements, all of George's figures rest on a suspect foundation.

If the voter registration list information had been combined with the driver's license/identification card list, then the figures may well have been different. Without having this additional information, it is speculative to suggest that the percentage of jurors selected of a particular race is disproportionate to the percentage in the total population. George's expert witness testified that he was not sure how the addition of the driver's license/identification card records would have affected the base percentage of African Americans.

The second major problem with George's statistical argument is that the data does not take into account excusals. Even if the 13% figure is presumed to be accurate, the greatest discrepancies between the population figures and the juror figures appeared in the jurors actually selected, not in the persons summoned. After the jurors were summoned, they were qualified by the court. Jurors could be excused based on various factors. Such excusals may well have had an impact on the number of African Americans jurors available for selection; however, George has not presented any evidence as to who was excused, why they were excused, and whether there was a discrepancy between excusals for African Americans and whites. Dr. Albiniak testified that he did not know how many of those in the jury pool were excused for valid reasons.

The third major problem with George's statistical analysis is that it fails to take into account holdover jurors. Dr. Albiniak's probability figures were based on an independent selection of jurors for each year. However, this is not a valid assessment because the selection of jurors was not entirely independent each year, but depended to a significant degree on the composition of the previous year's grand jury. One-third of the grand jury was composed of jurors held over from the previous year's grand jury. *See* S.C.Code Ann. § 14–7–1510 (Supp.1997).[2] Thus, if the 1991 grand jury was all-white,

---

2. The statute provides:

During the last term of the court of general sessions held in each county for any year six of the grand jurors then in service must be drawn as provided in this article who, together with twelve grand

then one-third of the seats on the 1992 jury would have definitely been taken up by whites. Thus, there would have been only 12, not 18, potential seats that would have been open for African American jurors. George's statistical data did not in any way take this factor into account.

■ Assuming arguendo that George's statistical information was valid, the discrepancies in this case are not comparable to those cases wherein equal protection violations have been upheld. For example, in *Castaneda*, an equal protection violation was found by the United States Supreme Court where Mexican–Americans constituted over 79% of the population of a county, but, over an 11–year period, only 39% of persons summoned for grand jury service were Mexican–American. *Castaneda*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498; *see Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (blacks constituted 60% of the general population, but 37% on the grand jury lists); *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (blacks listed on tax digest amounted to 27.1% of taxpayers, but only 9.1% on the grand jury venire); *Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (blacks made up 24.4% of taxpayers, but only 4 .7% of those on grand jury lists). In contrast, this case presents a comparison between 13% and 7.5%.

In *Castaneda*, the United States Supreme Court observed that as a general rule for large samples, if the difference between the expected value and the observed value is greater than two or three standard deviations,[3] then the hypothesis that the jury drawing was random would be suspect to a social scientist. *Castaneda*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498. In this case, George's expert testified that for each year between 1991 and 1996, the standard deviation was less than three. With the exception of 1993, every year between 1991

---

jurors selected in the manner prescribed, shall constitute the grand jury for the succeeding year. No person shall serve as a grand juror for more than two consecutive years.

S.C.Code Ann. § 14–7–1510.

**3.** The standard deviation is the measure of the predicted fluctuations from the expected value.

and 1996 was statistically within tolerance (i.e. the allowable deviation).

■ The third element of the *Castaneda* test is that "a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." *Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280, 51 L.Ed.2d at 510–11. George argues that the selection process is not racially neutral because although it may produce random results in the long-run, it does not produce representative juries in the short-term. This argument lacks persuasion because the selection process needs only be race neutral; there is not a strict legal requirement that every single jury be uniformly representative of the population. Additionally, George argues that the excusal process could be abused, but he does not offer evidence in support of this proposition.

■ Based on the foregoing, we conclude that George has not made a prima facie showing under the *Castaneda* test. However, even if it is assumed that George has made a prima facie showing of substantial underrepresentation, then the burden shifts to the State to rebut that case. *See Castaneda*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498; *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (Once a prima facie case of invidious discrimination is established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.). The State has met this burden.

Horry County, follows a jury selection process based on statutory provisions, as well as on a plan submitted to, and approved by, the South Carolina Supreme Court. The merging of the voter registration and driver's license/identification card information is done by the South Carolina Budget and Control Board. This list of potential jurors is prepared for the State Election Commission, which forwards it to Horry County. This information, in turn, is inputted into the local computer.

In Horry County, three jury commissioners—composed of the Clerk of Court, the Auditor, and the Treasurer—gather

and input their passwords into the computer to request a jury list. The passwords must be entered by each commissioner, and the commissioners do not know one another's passwords. The computer generates a random listing of potential jurors, based on the list forwarded by the State Election Commission. After the computer generates the list of potential jurors, the commissioners send notices to these individuals to appear before the court. In court, the Clerk calls out the names of those on the list. The judge then qualifies the jurors, determining if any excusals apply. Once the jurors are qualified, then the Clerk starts reading sequentially the names left on the list, until reaching the desired number of grand jurors (e.g. 18).

The commissioners testified that they could not alter the computer functions. Additionally, they did not remove the names of any African Americans from the jury list. The Clerk of Court testified that from 1991 to 1996, jurors were selected randomly through the use of the computer and that none of the commissioners removed any persons from the list of jurors or altered the computer list after it was printed. Further, no names were added to the list. The circuit court found "beyond a reasonable doubt that the procedure utilized by the jury commissioners in Horry County in the selection of this Grand Jury follows exactly the law of this State."

Based on the evidence offered, the State has established that Horry County uses race neutral selection criteria and procedures. In fact, the system attempts to make the selection process as neutral and random as possible. As the circuit court orally ruled: The "evidence and testimony in this case is absolutely void of any inference or indication that any skullduggery was used, that any abuse was used or that it was not racially neutral."

Thus, since George has not shown systematic exclusion of African Americans from the Horry County grand jury, we conclude the circuit court's order must be affirmed.

### CONCLUSION

Based on the foregoing, we **AFFIRM** the circuit court's order rejecting George's claim of an equal protection violation.

FINNEY, C.J., MOORE, WALLER and BURNETT, JJ., concur.