IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-30139

_____

KIRKSEY MCCORD NIX,

Petitioner-Appellant,

versus

BURL CAIN, Warden,
Louisiana State Penitentiary,

Respondent-Appellee.

- - - - - - - - - -
Appeals from the United States District Court
for the Western District of Louisiana
- - - - - - - - - -
February 22, 2001

Before BARKSDALE and BENAVIDES, Circuit Judges, and VELA[*], District
Judge.

PER CURIAM:[**]

Kirksey McCord Nix (Nix), convicted of murder and sentenced to
life imprisonment in Louisiana state court, appeals the denial of
federal habeas relief under 28 U.S.C. § 2254. This Court has
granted a certificate of appealability (COA) with respect to the
following claims: (1) whether the district court erred in denying
his request for discovery with respect to his claim that the

_____

[*]District Judge of the Southern District of Texas, sitting by
designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Lafayette Parish systematically excluded black persons from the jury selection process and whether the claim was without merit; (2) whether the district court erred in denying Nix's claim that the state suppressed the statement of the victim's wife that the robbers were masked and/or whether the prosecution knowingly relied on perjured testimony to the effect that the robbers were not masked; and (3) whether counsel was ineffective for failing to lay the proper foundation for admission of the police reports, which Nix contends were contradictory to the testimony of the victim's wife. Concluding that Nix is not entitled to relief on these claims, we affirm the district court's denial of habeas relief.

I.  FACTUAL AND PROCEDURAL HISTORY

At eleven o'clock on the night of April 10, 1971, James Whitman Knight (Knight) drove Nix and two other accomplices, Peter Mulé (Mulé) and John Fulford (Fulford), to the home of Frank Corso, which was located at 1301 Soldier Street, New Orleans, Louisiana.[1] The men believed that there were diamonds in Corso's home. Nix, Fulford, and Mulé,  all of whom were armed, exited the vehicle. Also, the men were carrying a bag. Knight was told to listen to the police scanner and to blow the horn if he heard of any police activity in the area.

Corso, his wife, and their three children were at home at this time. Corso had retired to bed at approximately 9:30 p.m. At

---

[1]  Prior to this time, the men had driven around the city looking at "target" houses.

midnight, Mrs. Corso went into the kitchen, and as she walked past the back door, she noticed that it was slightly ajar. She turned the light on and saw that the "screen door was jammed open."[2] She then saw "the arm of a man with a corduroy jacket on." Mrs. Corso saw a total of three men outside the back door. She screamed for her husband, and one of the men told her to "be calm, and no one will get hurt; we're coming in."

Mrs. Corso fled down the hallway. Awakened by his wife's screams, Mr. Corso secured his .32 caliber gun and confronted the men. While she was hiding in the bedroom, Mrs. Corso heard one of the men say that he had one of the children. After hearing gunfire, she exited the bedroom and saw that her husband and Nix had been shot. She picked up her husband's gun and shot at the intruders. Mulé helped Nix leave through the back door.[3] Approximately twenty-three shots were fired in the Corso residence.

Mrs. Corso attempted to telephone the police, but the phone line had been severed. After the police arrived, Mrs. Corso gave the officers a description of the assailants. She stated that "[o]ne was short, one was middle size, and a tall one."

---

[2] The evidence indicated that an hydraulic jack was used to spread the door jam to gain entry into the Corso residence. Mattie Henshaw, owner of Cornwell Tool Company, testified that the hydraulic jack and "slip-lock attachment" found near the scene of the homicide had been purchased from her company. She identified the purchaser as Mulé.

[3] Susan Corso, daughter of the deceased, identified Mulé as the man who helped the injured intruder exit her home.

3

Meanwhile, near the Corso residence, after driving in the neighboring area for approximately an hour, Knight heard gunshots. He then observed Fulford running toward him. Fulford informed Knight that Nix had been shot and instructed him to drive around the corner and retrieve Nix and Mulé. Fulford and Mulé helped Nix into the vehicle. The men did not have the bag with them.[4] At that time, Knight was informed of the events that had transpired during the breaking and entering of Corso's home. After returning the men to their apartments, which were in the same complex, Knight was instructed to get rid of the vehicle. After abandoning the vehicle, Knight went to Nix's apartment to check on him. Nix was lying in bed undressed. Knight could see that Nix had been shot in the chest. Nix told Knight that he was sure that he had "[g]ot him"--meaning Nix had shot Frank Corso.

The next morning, Travis Stallcup, a private pilot, was hired to fly Nix to Dallas, Texas for medical treatment of his gunshot wound.[5] After Nix arrived in Dallas, he was taken to a hospital.

---

[4] Police later found two leather bags outside the rear door of the Corso residence. The bags "contained several burglar type tools"-- a telephone headset, wire cutters, plastic ties, a police radio, two chisels, bullets, a crow bar, and pliers. An NOPD officer testified that plastic ties were often used as "disposable handcuffs."

[5] Stallcup, a private pilot from Texas, testified at Nix's trial that on the morning of April 11, 1971, he was contacted and instructed to rent an airplane and fly to New Orleans. Stallcup flew to New Orleans and Nix boarded the plane. Stallcup observed that Nix was hurt and vomiting. Upon landing in Dallas, Nix was transported in Stallcup's car to Stallcup's home. After Nix was disrobed, Stallcup observed a hole in his chest.

Dr. Ernest Poulus saw Nix in the emergency room. Based on the amount of internal infection and inflammation present, Dr. Poulus determined that Nix's wound was several hours old. Surgery was performed on Nix, but no bullet was removed.

Pursuant to court order, Dr. Edward H. DeMauy, a medical doctor with a specialty in the field of radiology, examined Nix to determine whether the bullet could be removed without harming Nix. The x-rays revealed a "metallic radial density pellet" and "a small metallic clip" in the pelvis area. The New Orleans Police Department had given Dr. DeMauy three pellets to determine whether they matched the x-ray of the pellet lodged in Nix. Dr. DeMauy concluded that one of the pellets given to him by the NOPD matched the x-ray pellet in Nix. The pellet had been identified as having been fired from a .32 caliber handgun-the same caliber handgun as owned by Mr. Corso.

At trial, Mrs. Corso testified that the men did not wear masks. She identified Mulé, Fulford, and Nix as the men who broke into her home. NOPD Officer Marcel David found a Walther 9mm automatic pistol lying in the street directly across from 1348 Soldier Street. A bullet was jammed in the chamber. Knight identified the Walther 9mm pistol found near the scene as the same type of gun as Nix's "P-38." Also, Sandra Decker testified that, on the night of the murder, she was with Knight's wife when Knight

5

informed her that Nix had been shot. Fulford also told Decker that Nix had been shot.

Irene D. Gvillo, manager of the Bayou Manor apartment complex, testified that she had rented the 4101 Davy Street apartment to Nix and his wife. She also had rented an apartment in the same complex to Fulford. Gvillo further testified that Mulé had previously lived at the complex as well.

Walter William Strata, Jr., a NOPD criminologist who specialized in blood identification, testified that he obtained a bed sheet and a section of mattress from Nix's apartment located at 4101 Davy Street in New Orleans. Lab tests indicated that the sheet and mattress contained blood; however, because there was an insufficient quantity of blood, it could not be determined whether the blood was of human or animal origin. From the same bedroom, Strata retrieved a section of carpet and a piece of gauze. Both tested positive for "group A unit human blood." Nix's blood type is A positive. Strata also found a map of New Orleans under that bed. The map had a line drawn from the Davy Street apartment to Madrid Street, which was one block above Soldier Street. An "X" had also been drawn on the map near Soldier Street. Nix now admits that there was a line drawn on the map from his apartment to Corso's home.

The defense called various witnesses, including Dr. Alvin M. Cotlar, who testified that given the findings upon Nix's admittance at the emergency room and during surgery, it was an "extremely

6

remote medical possibility" that Nix had been shot thirty-two hours prior to admittance, *i.e.,* it was unlikely that Nix had been shot during the gun battle at the Corso residence. Nix and Bobby LeQuirre testified that Nix had been shot by another man during an argument on the afternoon of April 11, 1971. The man they accused of shooting Nix was deceased at the time of Nix's trial. Also, the defense's story with respect to the timing of the shooting conflicted with the testimony of the pilot who transported Nix to Dallas.

The jury convicted Nix, Mulé, and Fulford of the murder of Frank Corso. The defendants were sentenced to life imprisonment. Nix's conviction and sentence were affirmed on direct appeal. *State v. Nix,* 327 So.2d 301 (La. 1975). After exhausting his state remedies, Nix filed a section 2254 petition in federal district court. The district court denied relief and a COA.

As set forth above, this Court granted a COA with respect to the following claims: (1) whether the district court erred in denying his request for discovery with respect to his claim that the Lafayette Parish systematically excluded black persons from the jury selection process and whether the claim was without merit; (2) whether the district court erred in denying Nix's claim that the state suppressed the statement of the victim's wife that the robbers were masked and/or whether the prosecution knowingly relied on perjured testimony to the effect that the robbers were not

masked; and (3) whether counsel was ineffective for failing to lay the proper foundation for admission of the police reports, which Nix contends were contradictory to the testimony of the victim's wife. We now address these claims.

II   ANALYSIS

A.   STANDARD OF REVIEW

Nix's murder conviction became final prior to the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996). We have held that prisoners challenging convictions that became final prior to the AEDPA's effective date are accorded one year after the effective date of the AEDPA (April 24, 1997) to file for relief under § 2254. *Flanagan v. Johnson*, 154, F.3d 196, 202 (5th Cir. 1998). The AEDPA applies to petitions filed after its enactment date. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059 (1997). Nix filed the instant federal habeas petition on April 16, 1997. Thus, the AEDPA applies to Nix's petition, which was timely filed.

Under the AEDPA:

> we must defer to the state court unless its decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides

8

> a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, __ U.S. __, 120 S.Ct. 1495, 1523 (2000). Under § 2254(d)(1)'s "unreasonable application" language, a writ may issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S.Ct. at 1523. Factual findings are presumed to be correct, *see* 28 U.S.C. § 2254(e)(1), and we will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*; § 2254(d)(2).

*Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).

## A. SYSTEMATIC EXCLUSION OF BLACKS FROM JURY

Nix contends that African-Americans were systematically excluded from the jury selection process in violation of his equal protection and due process rights. In *Alexander v. Louisiana,* the Supreme Court recognized that it was well established that a black defendant's criminal conviction "cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which [African-Americans] were excluded by reason of their race." 405 U.S. 625, 628, 92 S.Ct. 1221, 1224 (1972). Of course, the "principles that apply to the systematic exclusion of potential jurors on the ground of race are essentially the same for grand juries and for petit juries, however." *Alexander,* 405 U.S. at 627 n.3, 92 S.Ct. at 1223. In *Alexander*, the petitioner argued that there had been a "consistent

process of progressive and disproportionate reduction of the number of [black persons] eligible to serve on the grand jury at each stage of the selection process until ultimately an all-white grand jury was selected to indict him." *Id.* at 629, 92 S.Ct. at 1224-25.

The Supreme Court explained that once a prima facie case of discrimination was established, the burden of proof shifts to the state to rebut the presumption of unconstitutional action by demonstrating that permissible race-neutral selection criteria and procedures had been used. *Id.* at 632, 92 S.Ct. at 1226. The Court held that the petitioner had established a prima facie case of discrimination on the basis of statistics and because the selection procedures were not racially neutral. In *Alexander,* the state was unable to rebut the presumption of unconstitutional action.[6]

Here, however, before reaching the merits of Nix's claim, we must determine whether the rule upon which Nix relies constitutes a new rule that cannot be retroactively applied in a federal habeas proceeding. *See Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075 (1989).[7] In *Teague,* a plurality of the Supreme Court

---

[6] In the case at bar, citing *Alexander v. Louisiana,* the district court disposed of this claim as follows: "Other than a statement of his claim, petitioner points to no evidence in the record to support his claim. Therefore, petitioner has not established a prima facie case of discrimination in the selection of jurors in his case."

[7] Recently, this Court has held that "absent a compelling, competing interest of justice in a particular case, a federal court should apply *Teague* even though the State has failed to argue it." *Jackson v. Johnson,* 217 F.3d 360, 363 (5th Cir. 2000).

10

adopted Justice Harlan's view of retroactivity that a new rule would not be applied on collateral review to cases that became final prior to the announcement of the new rule. Acknowledging that the task of determining whether a case announces a new rule is often difficult, the plurality expressly did not "attempt to define the spectrum of what may or may not constitute a new rule" for purposes of retroactivity. 109 S.Ct. at 1070. Generally speaking, however, a case announces a new rule if it breaks new ground or imposes a heretofore new obligation on the States or the federal government. *Id.* In other words, if the result was not dictated by precedent existing at the time the petitioner's conviction became final, such a case announces a new rule.

We have noted the view that the AEDPA codifies *Teague* at least "to the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final." *Montoya v. Johnson,* 2000 WL 1224727 *3 n.7 (5th Cir. Sept. 14, 2000) (citation and internal quotation marks omitted); *see also Muhleisen v. Ieyoub,* 168 F.3d 840, 844 n.2 (5th Cir. 1999). The AEDPA appears to place a more onerous burden on the petitioner than *Teague.* More specifically, under the AEDPA we must "consider only U.S. Supreme Court rulings." *Muhleisen,* 168 F.3d at 844 n.1.

We now determine whether there was Supreme Court precedent existing at the time Nix's conviction became final that dictates

11

the result sought by Nix.  Nix, a self-described "white citizen and Native American Indian," was convicted in 1972, and his conviction became final in 1976.  In 1998, the Supreme Court held that a white defendant has standing to raise equal protection and due process claims with respect to discrimination against black persons in the selection of grand jurors.  *Campbell v. Louisiana,* 523 U.S. 392, 118 S.Ct. 1419 (1998).  In *Campbell,* the Supreme Court opined that it could determine whether the petitioner had standing to make these constitutional claims by "applying rules established in prior cases."  *Campbell v. Louisiana,* 118 S.Ct. at 1422.  Indeed, with respect to standing to raise the equal protection challenge, the Supreme Court relied largely on its decision in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364 (1991).  As the Sixth Circuit has explained, the Supreme Court, in *Campbell,* "applied *Powers,* a petit jury case, to the grand jury, and held that '[i]f [the grand jury] process is infected with racial discrimination, doubt is cast over the fairness of all subsequent decisions,' which represents injury in fact for Campbell even though he was not a member of the excluded group."  *Coe v. Bell,* 161 F.3d 320, 352 (6th Cir. 1998) (quoting *Campbell,* 118 S.Ct. at 1423-24) (brackets in opinion).

For purposes of this appeal, we will assume *arguendo* that the result in *Campbell* was dictated by the Supreme Court's prior case of *Powers v. Ohio.*  That, however, does not satisfy Nix's burden of showing that there was existing precedent in 1976 in that *Powers v.*

12

*Ohio* was decided in 1991, some fifteen years after Nix's conviction became final. Thus, the next question is whether *Powers v. Ohio* constituted a new rule.

In *Fisher v. State of Texas,* we expressly recognized that two other circuits had held that *Powers v. Ohio* announced a new rule of law under *Teague* and that neither exception to *Teague* applied. 169 F.3d 295, 306 (5th Cir. 1999) (citing *Nguyen v. Reynolds,* 131 F.3d 1340, 1351-52 (10th Cir. 1997); *Jones v. Gomez,* 66 F.3d 199, 204 (9th Cir. 1995)).[8] Further, the Sixth, Seventh, and Eleventh Circuits likewise have so held. *See Echlin v. LeCureux,* 995 F.2d 1344, 1351 (6th Cir. 1993); *Van Daalwyk v. United States,* 21 F.3d 179, 180 (7th Cir. 1994); *Farrell v. Davis*, 3 F.3d 370, 372 (11th Cir. 1993).

As set forth above, in *Campbell v. Louisiana,* the Supreme Court also held that a white defendant alleging discriminatory exclusion of black persons from grand jury selection had standing to litigate whether his conviction was obtained by means or procedure that contravene *due process*. 118 S.Ct. at 401. In making this determination, the Supreme Court referenced *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163 (1972). Although *Peters v. Kiff* clearly was in existence at the time Nix's conviction became final,

---

[8] Relying in part on these holdings, we concluded that Fisher's claim that peremptory strikes based on a venire member's religion violated the Equal Protection Clause was barred by *Teague. Fisher,* 169 F.3d at 306.

we nevertheless must determine whether its holding dictated the result Nix seeks.

In *Peters v. Kiff,* six justices concluded that a white defendant had standing to raise a due process challenge to the system used to select his grand jury on the basis that it discriminated against black persons. 407 U.S. at 504-05, 92 S.Ct. at 2169. However, as the Sixth Circuit has explained, three of the six justices believed that standing arose from both the Constitution and from 18 U.S.C. § 243, a criminal statute that forbids public officials from excluding persons from grand jury service based on race. *Coe v. Bell,* 161 F.3d at 353 (citing *Peters,* 407 U.S. 497-505, 92 S.Ct. 2165-69). The other three justices believed that standing arose only from the statute. *Id.* (citing *Peters,* 407 U.S. at 505-07, 92 S.Ct. 2170-71).[9] Under these circumstances, we agree with the Sixth Circuit that:

> *Peters* cannot be said to stand for the proposition that the constitution gave Peters . . . the ability to raise a due-process challenge to the exclusion of Blacks . . . from his grand jury. Indeed, six justices declined to so hold. Rather, *Peters* stands only for the proposition that the criminal statute forbidding such exclusion produced the ability to assert such a claim.

*Coe v. Bell,* 161 F.3d at 354.

---

[9] In his dissenting opinion, Chief Justice Burger, with whom Justices Blackmun and Rehnquist joined, read the concurring opinion to rest "on the statutory prohibition against racially exclusive juries found in 18 U.S.C. § 243." 407 U.S. at 511, 92 S.Ct. at 2173 (Burger, J., dissenting).

14

Accordingly, because we conclude that (1) *Powers v. Ohio* announced a new rule in 1991 with respect to a white defendant's standing to raise an equal protection challenge regarding the exclusion of black persons from the jury selection process, and (2) *Peters v. Kiff* did not *dictate* the result Nix now seeks with respect to the due process challenge, we conclude that Nix's claims are barred by *Teague.*[10]

B. SUPPRESSION OF EVIDENCE

Nix contends that the State suppressed a statement from Mrs. Corso indicating that the intruders were masked. At trial, she testified that the intruders did not wear masks.

The state has a duty to disclose evidence favorable to the accused that is material to guilt or punishment. *See Brady v. Maryland,* 373 U.S. 83, 86-87 (1963). To establish this due process violation, an accused must show that the State withheld evidence, that the evidence was favorable, and that the evidence was material to the defense. *Little v. Johnson*, 162 F.3d 855, 861 (5th Cir. 1998). By its nature, a *Brady* claim arises when the evidence, known by the prosecution, is not discovered by the defendant until after the trial. *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994). If the evidence would be available through reasonable diligence by the defendant, there is no *Brady* violation. *United*

_____

[10] In light of our determination that this claim is barred under *Teague,* we need not discuss Nix's argument that the district court erred in denying him discovery with respect to this claim.

15

*States v. Mulderig*, 120 F.3d 534, 541 (5th Cir. 1997).

In ruling on this claim, the district court denied relief opining as follows: "The record shows that police included this information in a search warrant issued during the investigation of the crime. Thus, the information was not withheld." We agree that Nix has failed to demonstrate that any evidence was withheld.

Nix does not contest the fact that the search warrants indicated that the assailants wore masks, and he does not aver that he was denied access or was otherwise unaware of the search warrants at the time of trial. Indeed, Nix admits in his brief that defense counsel "attempted to introduce those parts of the initial police report and search warrant affidavits that he had. He attempted to impeach the state's key/star witnesses, as well as the police officers who took the statements and/or compiled the police report and/or search warrant affidavits." Nix clearly has failed to demonstrate that any evidence was withheld.[11] He is not entitled to relief on this claim.

---

[11] In a related claim, Nix asserts that because Mrs. Corso testified at trial that the men were not wearing ski masks, the State knowingly relied upon perjurious testimony. "A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected." *Goodwin v. Johnson,* 132 F.3d 162, 185 (5th Cir. 1998) (citations and internal quotation marks omitted). To obtain relief based upon the prosecutor's use of perjured testimony or failure to correct such testimony, a habeas petitioner must demonstrate that (1) the testimony was actually false; (2) the state knew it was false; and (3) the testimony was material. *Id.* Because Nix has not demonstrated that Mrs. Corso's testimony was actually false, this claim fails.

16

C. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Nix claims that counsel was ineffective for failing to lay the proper foundation for admission of certain impeachment evidence, which he contends is contradictory to Mrs. Corso's trial testimony. During cross-examination of Mrs. Corso, defense counsel attempted to introduce the "affidavits connected with search warrants" and the police reports related to the murder. Counsel, apparently seeking to use the documents as impeachment evidence, stated that Mrs. Corso's trial testimony was inconsistent with her statements contained in the police officers' affidavits and reports. The court refused to admit the documents, finding that counsel's attempted impeachment of Mrs. Corso's testimony with documents drafted by others was improper.

To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984). To establish prejudice, the petitioner must show that "it is reasonably likely that the jury would have reached a different decision absent counsel's unprofessional errors." *Faulder v. Johnson,* 81 F.3d 515, 519 (5th Cir. 1996).

Assuming arguendo that counsel's performance was deficient, we are not persuaded that Nix has shown prejudice. Even assuming counsel rendered deficient performance by failing to lay the proper

17

foundation for the introduction of the search warrant affidavits, we do not believe there is a reasonable probability that the outcome of the trial would have been different.

Knight, the driver of the getaway vehicle, testified that Nix participated in the robbery of the Corso residence and was shot as a result of the ensuing gun battle. Knight's testimony was corroborated. Sandra Decker testified that, on the night of the murder, she was with Knight's wife when Knight informed her that Nix had been shot. Fulford also told Decker that Nix had been shot.

The police found a map of New Orleans under a bed in Nix's apartment. The map had a line drawn from the Davy Street apartment to Madrid Street, which was one block above Soldier Street. An "X" had also been drawn on the map near Soldier Street. In his brief before this Court, Nix characterizes this evidence as "the only truly incriminating evidence," admitting that there was a line drawn on the map from his apartment to Corso's home.

Near the Corso residence, the police found a Walther 9mm automatic pistol lying in the street. A bullet was jammed in the chamber. Knight identified the Walther 9mm pistol found near the scene as the same type of gun as Nix's firearm.

Stallcup, the private pilot of the plane that transported Nix from New Orleans to Dallas, testified that he was contacted in the early morning hours of April 11, 1971, for the purpose of flying Nix from New Orleans to Dallas, Texas, for medical treatment.

18

Stallcup observed that Nix had been shot. Dr. DeMauy testified that Nix probably had a .32 caliber pellet lodged in his body--the same caliber gun that Corso had used to shoot at the intruders.[12] Accordingly, Nix has failed to demonstrate prejudice with respect to his claim of ineffective assistance of counsel.

For the above reasons, the district court's judgment is AFFIRMED.

VELA, District Judge, dissenting:

In reaching its decision, the majority assumes that Nix alleges only constitutional violations. Nix, however, also alleges an 18 U.S.C. § 243 violation, which, by the majority's own admission, if alleged, gives him standing to assert his claim. For this reason, I respectfully dissent.

On April 16, 1997, pursuant to 28 U.S.C. § 2254, Nix filed a pro-se petition for a writ of habeas corpus. In his petition, Nix, a non-African-American, alleges that African-Americans were systematically excluded from his jury selection process violating the Sixth and Fourteenth Amendment, and sought discovery regarding his claim. This court granted Nix a certificate of appealability on the issue of "whether the district court erred in denying Nix's request for discovery with regard to his claim that Lafayette

---

[12] Although Nix admitted at trial that he had been shot, he claimed that it happened during a dispute with another man. The man Nix accused of shooting him was deceased at the time of trial. In any event, the time line with respect to Nix's version of the events conflicts with the time line given by the pilot who transported him to Dallas, Texas.

Parish systematically excluded blacks from the jury selection process and whether the court erred in finding that the claim was without merit."

Nix filed his petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Therefore, the AEDPA governs his petition. *See Williams v. Taylor,* 529 U.S. 362, 120 S. Ct. 1495, 1518, 146 L. Ed. 2d 389 (2000). Under the AEDPA, a petitioner is entitled to relief, if the state court's adjudication on the merits resulted in a decision that was contrary to or involved an unreasonable application of a "clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254 (1997). The statutory phrase "clearly established federal law, as determined by the Supreme Court of the United States," refers to the Court's holding, as opposed to its dicta, decided before the petitioner's conviction and sentence became final. *Williams,* 120 S. Ct. at 1523. Accordingly, the next step in the analysis, then, is to determine what the Court's holdings were at the time Nix's conviction and sentence became final.

"A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Caspari v. Bohlen,* 510 U.S.

383, 390, 114 S.Ct. 948, 953, 114 L. Ed. 2d 236 (1994).  The Louisiana Supreme Court affirmed Nix's conviction and sentence on December 8, 1975, and denied Nix's petition for rehearing on February 20, 1976.  Nix did not file a petition for writ of certiorari with the United States Supreme Court.  Therefore, Nix's conviction and sentence became final on May 20, 1976, ninety days later, when the time to file a petition for a writ of certiorari expired.  Sup. Ct. R. 13 & 30.

The majority holds that a non-African-American first had standing to raise an equal protection challenge to the systematic exclusion of African-Americans from her jury selection process in *Powers v. Ohio*[13] and first had standing to raise a due process challenge in *Campbell v. Louisiana*.[14]  The majority, further, holds that *Peters v. Kiff*[15] stands for the proposition that a non-African-American defendant's standing to challenge the systematic exclusion of potential African-American jurors from her jury selection process arises only under 18 U.S.C. § 243 and not the Constitution.  I agree that these are correct statements of the law.  Moreover, the majority correctly concludes that *Powers v. Ohio* and *Campbell v. Louisiana* were decided after Nix's conviction and sentence became final and that *Peters v. Kiff* was decided before.  Accordingly, Nix, at the time his conviction and sentence became final, could only have standing to challenge the systematic exclusion of African-Americans from his jury

---

[13]499 U.S. 400, 11 S. Ct. 1364, 113 L. Ed. 411 (1991).

[14]523 U.S. 392, 118 S. Ct. 1419, 140 L. Ed. 2d 551 (1998).

[15]407 U.S. 493, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972).

21

selection process under 18 U.S.C. § 243. Thus, Nix would have standing to challenge the exclusion, if he alleged an 18 U.S.C. § 243 violation. The majority, however, assumes that he alleged only constitutional violations; therefore, he does not have standing to challenge the exclusion and is thereby not entitled to discovery regarding his claim. I disagree; a fair and just reading of Nix's petition, supports a finding that he alleged not only constitutional violations, but also an 18 U.S.C. § 243 violation.

A petition for writ of habeas corpus "shall allege the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, *if known*." 28 U.S.C. § 2242 (1997) (emphasis added). As such it is a long-standing rule that pro-se habeas petitions must be liberally construed in the petitioner's favor and are not to be held to the same stringent and rigorous standards as pleadings filed by lawyers. *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999); *P. C. McCloud v. Wainwright,* 508 F.2d 853, 854 (5th Cir. 1975); *see also Price v. Johnson,* 334 U.S. 266, 292, 68 S. Ct. 1049, 1063, 92 L. Ed. 1356 (1948) ( "[Pro-se] [p]risoners are often unlearned in the law and unfamiliar with the complicated rules of pleading . . . [thus,] we cannot impose on them the same high standards of the legal art which we might place on members of the legal profession . . . especially . . . where the imposition of those standards would have a retroactive and prejudicial effect on the prisoner's inartistically drawn petition."), *rev'd on other grounds, McCleskey v. Zant,* 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991); *cf Haines v. Kerner,* 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972) (holding a pro-se complaint "to less stringent standards than formal pleadings drafted by lawyers"); *Holiday v. Johnson,* 313 U.S. 342, 350, 61 S. Ct. 1015, 1017, 85 L. Ed. 1392 (1941) ("A petition for habeas corpus ought not to be scrutinized with technical nicety. Even if it is insufficient in

substance it may be amended in the interest of justice."). Thus, a pro-se habeas petitioner need only allege the facts giving rise to the cause of action; she need not plead the law. *Johnson v. Puckett,* 929 F.2d 1067, 1070 (5th Cir. 1991); *Guidroz v. Lynaugh,* 852 F.2d 832, 834 (5th Cir. 1988).

> 18 U.S.C § 243 states:

> No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for services as grand or petit juror in any court of the United States, or of any State on account of ***race, color***, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000.

18 U.S.C. § 243 (2000) (this statute has not been amended since June 25, 1948) (emphasis added).

In his petition, Nix specifically states:[16]

> Claim #2: Systematic Exclusion of 'Blacks'–Did the procedure in which petitioner's jury venires were selected to invidiously discriminate against Blacks, and thus 'systematically exclude' a distinguishable class of people from the grand jury that indicted him and petit jury which tried him, in violation of the Sixth and Fourteenth Amendments to the United States Constitution?

Petitioner's Memorandum of Facts at 10 attached to his Petition for Writ of Habeas Corpus (hereinafter "Memorandum"). Failing to construe Nix's petition liberally, the majority assumes that Nix alleges only constitutional violations and not an 18 U.S.C. § 243 violation.

Admittedly, Nix does not expressly mention "18 U.S.C § 243" or "statutory violation" in his petition. This Court, however, has on at least three occasions, construed a pro-se habeas petition as alleging one claim even though that specific claim is not expressly stated in the petition. In *Wiggins v. Procunier,* a panel of this Court concluded that a pro-se habeas petitioner alleged that he was denied his right to counsel by alleging that he was denied his right to represent himself. 753 F.2d

---

[16]All scrivener's errors and omissions are contained in the original.

23

1318, 1320 (5th Cir. 1985). In *Bledsue v. Johnson,* a panel of this Court accorded a pro-se habeas petition "broad interpretation" and concluded that a "claim of insufficient proof of intent implicitly presented the issue of weight" even though the petition's "plain language . . . did not explicitly pinpoint the issue of weight." 188 F.3d at 255. Finally and most notably, in *Johnson v. Puckett,* a panel of this Court concluded that the language, "discrimination in selection of the Grand Jury Foreman existed at the time of Petitioner's Indictment" and "Petitioner was denied of [sic] due process," in a pro-se habeas petition, without more was "sufficient to allege a claim for relief under the Equal Protection Clause" even though the phrases "Equal Protection Clause" or "Fourteenth Amendment" did not expressly appear in the petition. 929 F.2d at 1070.

Analogously, a unanimous United States Supreme Court in *Ford v. Georgia,* in a non-habeas, non-pro-se case, concluded that a petitioner alleged a violation of the Equal Protection Clause even though the phrase "Equal Protection Clause" was never expressly stated or mentioned and the petitioner "cited the Sixth Amendment, not the Fourteenth." 498 U.S. 411, 418-19, 11 S. Ct. 850, 854-55, 112 L. Ed. 2d 935 (1991). The Court further stated "[w]e think [the] petitioner must be treated as having raised such a claim, although he certainly failed to do it with the clarity that appropriate citations would have promoted." *Id.* at 418 and 855.

Just because Nix did not expressly mention "18 U.S.C. § 243 " or "statutory violation," and did expressly mention the Sixth and Fourteenth Amendments does not mean that he has not alleged an 18 U.S.C. § 243 violation. *See Puckett,* 929 F.2d at 1070. Nix has alleged that potential African-American jurors were systematically excluded from his jury selection process. *See generally* Memorandum at 10-13. And it is undisputed that the systematic exclusion of potential African-American jurors from the jury selection process violates 18 U.S.C. § 243. *Peters v. Kiff,* 407 U.S.

24

493, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972).  Thus, Nix here, just as the petitioner in *Johnson v. Puckett*, alleged facts that are sufficient to allege a violation of one provision, even though he did not expressly mention that provision and did mention another.  *See Puckett,* 929 F.2d at 1070.

Considering the aforementioned cases, especially *Johnson v. Puckett*, and our duty to construe a pro-se habeas petition liberally, I believe that Nix alleged an 18 U.S.C § 243 violation.  Accordingly, I believe that Nix has standing to challenge the systematic exclusion of African-Americans jurors from his jury selection process and that we should reverse.  For this reason, I respectfully dissent.  Alternatively and at the very least, I believe that we should remand this case so that Nix may amend his pleading to expressly state "18 U.S.C. § 243" and this case be decided on the facts.  *See Haggard v. State of Alabama,* 494 F.2d 1187, 1189 (5th Cir. 1974); *Fryer v. Mac Dougall,* 462 F.2d 1093, 1093-94 (5th Cir. 1972).