JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Jack Carlisle appeals his convictions. Carlisle assigns the following errors for our review:
 "I. Jack Carlisle was deprived his constitutional right to equal protection under the law, when the State removed all black male jurors from the venire panel, leaving him entirely without a jury of his peers."
 "II. Jack Carlisle was denied his right to confront and cross-examine witnesses, his right to present a defense and his right to a fair trial and due process of law, in violation of the U.S. Constitution's Fifth, Sixth and Fourteenth Amendments and Article I, Section 10 and 16 of the Ohio Constitution, when the court improperly barred him from introducing evidence that the alleged child victim had accused other family members of committing the sexual abuse charged in the case."
 "III. Jack Carlisle was denied his constitutional right to a fair trial before a jury free from outside influences by repeated introduction of victim impact evidence during the State's case in chief."
 "IV. Mr. Carlisle's Sixth Amendment right to effective assistance of counsel was violated where trial counsel failed to act zealously on his behalf in several instances."
 {¶ 2} Having reviewed the record and pertinent law, we affirm Carlisle's convictions. The apposite facts follow.
 {¶ 3} On June 9, 2006, a Cuyahoga County Grand jury indicted Carlisle on one count each of rape, gross sexual imposition, and kidnapping. All three counts had sexually violent predator specifications attached. The matter proceeded to a jury trial, which commenced on May 7, 2007. The trial court declared a mistrial after the jury failed to reach a verdict. On June 8, 2007, a second jury trial commenced.
 Jury Trial *Page 3 {¶ 4} The evidence presented at trial established that the six-year old victim, K.C., [1] and her nine-year old brother were foster children, since infancy, of Carlisle and his wife Carol. The minor children resided in University Heights, Ohio with the Carlisles, their two adult sons, one of whom was mentally disabled, and with Carol's adult daughter. K.C. either slept on a mattress in the bedroom Carlisle shared with his wife, or sometimes on a sofa bed in the living room. K.C.'s brother slept in the attic with Carol's adult daughter.
 {¶ 5} On May 12, 2006, Carol asked Carlisle to babysit K.C. and her brother, while she and her disabled adult son went to visit her brother, who was visiting from out of town. When Carol left to visit her brother, her older son was at work and her adult daughter was upstairs in the attic.
 {¶ 6} At trial, K.C. testified that on May 12, 2006, she and her brother were watching television in the room that Carlisle shared with Carol. K.C. testified that when they heard Carlisle approaching, her brother, who was not supposed to be in the room, hid in the closet. K.C. continued to watch television.
 {¶ 7} K.C. testified that Carlisle entered the room, closed the door behind him, sat on his bed and told her to come to him, but she continued to watch television. K.C. testified that Carlisle came over to her, picked her up, and placed her on the bed. K.C. testified that *Page 4 
Carlisle laid her on her back, then removed his pants, put lotion on his penis, climbed on top of her, and inserted his penis inside her.
 {¶ 8} K.C. testified that Carlisle began moving side to side and up and down. K.C. testified that she felt gooey stuff inside her "private." K.C. testified that she told Carlisle to stop. K.C. stated that Carlisle eventually stopped, got off her, and later lay on his bed pretending to sleep.
 {¶ 9} K.C. testified that sometime later, her brother sneaked out of the closet, came over to her, and motioned her to follow him out the room. K.C. testified that she and her brother crawled out the room, went upstairs, and told Carol's adult daughter.
 {¶ 10} K.C.'s brother, Kh.C., testified that on May 12, 2006, he was watching television in the bedroom Carlisle shared with his wife. When he heard Carlisle coming, he hid in the closet because he did not have permission to be in the room. Kh.C. testified that when Carlisle entered the room, Carlisle said "get out of the closet," but he remained hidden under some clothes.
 {¶ 11} Kh.C. testified that he watched as Carlisle put K.C. on the bed, removed his pants, got on top of K.C. and began moving up and down. Kh.C. testified that he heard K.C. say "ouch." Kh.C. testified that Carlisle eventually got off K.C., unlocked the bedroom door, and then went to lay on his bed. Kh.C. testified that he later sneaked out of the closet, went over to K.C., and the two crawled out of the room to report the incident to Carol's adult daughter. *Page 5 
 {¶ 12} At trial, Kh.C. demonstrated how he crawled from the closet to K.C. and out of the room. Kh.C. also testified about a picture he had drawn at the police station, shortly after the incident, which depicted the bedroom and the closet where he hid.
 {¶ 13} Alshea Laney, Carol's adult daughter, testified that on the evening of May 12, 2006, she was upstairs reading when Kh.C. entered the room crying. Kh.C. indicated that he had seen Carlisle on top of K.C. going up and down. Laney testified that she spoke with K.C., who stated "Jack did something wrong." Laney testified that she telephoned her sister, and after discussing the matter, they agreed K.C. and Kh.C. should tell Carol when she returned home.
 {¶ 14} Later that evening when Carol returned home, the children reported the incident. After visually inspecting K.C., Carol took both children to the University Heights police station, where K.C. and Kh.C. were interviewed separately. Carol then took the children to Hillcrest Hospital, where a rape kit examination was completed.
 {¶ 15} While at the hospital, Carol gave consent to the University Heights police to search the marital home. The police proceeded to the home, informed Carlisle there was an allegation of abuse, and arrested him. The police then executed the search, wherein they confiscated Carlisle's bedding, a bottle of lotion, and the clothing that was on the bed. The police also took the bedding from the mattress K.C. slept on.
 {¶ 16} At trial, the evidence established that after scientific testing, nothing was detected on the bedding taken from the house. Carlisle's DNA was found on his underwear, *Page 6 
but the examiners could not determine whether the DNA was seminal fluid. Some seminal fluid was detected on Carlisle's undershirt and trousers. Testing conducted on K.C.'s underwear revealed the possible presence of male DNA. Further testing revealed the presence of potentially two contributing males related through their paternal lineage.
 {¶ 17} At trial, several of the police officers from the City of University Heights, who arrested, processed, or interviewed Carlisle testified. Detective Frank Gromosky testified that after the search was executed, he conducted a tape-recorded interview of Carlisle. Detective Gromosky testified that during the interview, Carlisle indicated that at the time of his arrest, the police told him that the allegations involved child abuse. Detective Gromosky further testified that during the interview, Carlisle indicated that he did not and could not have assaulted K.C. because he was impotent and had a host of other medical problems. Detective Gromosky testified that Carlisle also claimed that he had not had sex for three or four years.
 {¶ 18} Detective Steven Williams testified that they conducted a second tape-recorded interview with Carlisle. Detective Williams testified that between the first and second interviews, they spoke with Carlisle's wife, who indicated that the couple had engaged in sexual intercourse within the past six to seven months.
 {¶ 19} Detective Williams testified that during the second interview, Carlisle recalled that on May 12, 2006, his wife asked him to babysit K.C. and Kh.C., while she visited her relatives. Detective Williams testified that Carlisle recalled that when he went downstairs, he *Page 7 
discovered that K.C. had spilled toothpicks all over the floor, and he instructed her to pick them up, after which he told K.C. to sit in a "time out" chair.
 {¶ 20} Detective Williams testified that Carlisle indicated that he dozed off on the sofa, but was awaken to K.C. climbing a chair trying to reach crayons. He placed her in "time out" again, and K.C. began to cry, at which time he relented and allowed her to go to the third floor. Carlisle indicated that he took this opportunity to take a nap upstairs in his bedroom.
 {¶ 21} Detective Williams testified that Carlisle indicated that while in his bed, K.C. entered the room and wanted to change into her pajamas. Carlisle indicated that after K.C. changed into her pajamas, she climbed into the bed; he asked her to leave, and told Kh.C., whom he knew was hiding in the closet, to get out. Carlisle stated that K.C. and Kh.C. proceeded to watch television and then left the room, after which he went to sleep.
 {¶ 22} Detective Williams testified that Carlisle indicated that he did not awake until his wife returned home, and later informed him that she had to go back out. Carlisle indicated that after his wife left with K.C. and Kh.C., he went downstairs to watch television and later fell asleep. Carlisle stated that his son woke him about 1:30 a.m., when the police arrived.
 {¶ 23} At trial, Dr. Alan Seftel, a urologist from University Hospital, with special training in the area of erectile dysfunction, testified as an expert on impotence. Dr. Seftel opined that the finding of seminal fluid on Carlisle's clothing indicated that Carlisle was *Page 8 
capable of at least a partial erection and ejaculation. Dr. Seftel testified that the presence of seminal fluid could have resulted from a nocturnal emission, which would demonstrate that Carlisle was having erections and could ejaculate. Finally, Dr. Seftel testified that despite Carlisle's various medical ailments, he remained capable of erections.
 {¶ 24} Dr. Marina Molinari-Zuzek said that she was the attending physician at Hillcrest Hospital and treated K.C. on May 12, 2006. Dr. Molinari-Zuzek testified that K.C. indicated that Carlisle was rubbing up and down and side to side with his underwear off and told her not to tell anybody. K.C. also indicated that her brother, who was in the closet, saw it happen. Dr. Molinari-Zuzek testified that K.C. indicated that her vaginal area was hurting.
 {¶ 25} Dr. Molinari-Zuzek testified that her examination revealed that K.C.'s entire vaginal area was swollen, severely red and irritated. As a result of her examination, Dr. Molinari-Zuzek testified that it was her opinion that inappropriate sexual contact had taken place. Dr. Molinari-Zuzek testified that she could not tell if penetration occurred, but she suspected it did not. Dr. Molinari-Zuzek further testified that the condition of K.C.'s vaginal area could not be explained by an accidental injury.
 {¶ 26} Carol testified that she and Carlisle had been married for twenty-seven years and raised four of their own children, and several foster children, including K.C. and her brother Kh.C. Carol testified that the day after she took the children to the police, she began to suspect that K.C. and Kh.C. were not telling the truth. Carol testified that while at the hospital the previous night, the children were running, jumping around, and doing *Page 9 
cartwheels. Carol testified that both K.C. and Kh.C. were being treated for various behavioral issues, including lying. Carol testified that she later returned to the police station, voiced her concerns and asked them to investigate further, but they refused. Carlisle took the stand in his own defense, and his testimony conformed in large part to the tape-recorded interviews, which were played in court. Carlisle testified that on May 12, 2006, he was very tired when he arrived home from work and not happy that Carol needed him to babysit the children. Carlisle testified that at one point, both K.C. and Kh.C. were playing in the closet and swinging on the bars. He stated he told them to stop and instructed them to sit and quietly watch television. Carlisle testified that he fell asleep while the children were watching television.
 {¶ 27} At the conclusion of the trial, the jury acquitted Carlisle of rape, but found him guilty of kidnapping and gross sexual imposition. The trial court also acquitted Carlisle of the sexually-violent specifications. On July 10, 2007, the trial court sentenced Carlisle to concurrent prison terms of three years on the kidnapping charge and one year on the gross sexual imposition charge. The trial court also found Carlisle to be a sexually-oriented offender.
 Peremptory Challenge {¶ 28} In the first assigned error, Carlisle argues he was denied a fair trial when the State used its peremptory challenges to remove all the black male jurors from the venire panel. We disagree. *Page 10 
 {¶ 29} In order to state a prima facie case of purposeful discrimination under Batson v. Kentucky, [2] an accused must demonstrate: (1) that members of a recognized racial group were peremptorily challenged; and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race.[3] AlthoughBatson is a criminal case, a private litigant in a civil case is also precluded from using peremptory challenges to exclude jurors on account of race.[4]
 {¶ 30} If the accused makes a prima facie case of discrimination, the state must then come forward with a neutral explanation.[5] As set forth in Batson:
 "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. See McCray v. Abrams [C.A. 2, 1984], 750 F.2d 1113, at 1132; Booker v. Jabe,(C.A. 6 1985), 775 F.2d 762, 773, cert. pending, No. 85-1028, certiorari granted and judgment vacated (1986), 478 U.S. 1001, But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption — or his intuitive judgment — that they would be partial to the defendant because of their shared race. * * * Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or *Page 11 
`[affirming] [his] good faith in making individual selections'. Alexander v. Louisiana (1972), 405 U.S. 625, at 632, 92 S. Ct. 1221, 31 L. Ed. 2d 536. If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause `would be but a vain and illusory requirement'. Norris v. Alabama, (1935), 294 U.S. 587, 79 L. Ed. 1074, 55 S. Ct. 579, at 598. The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination."[6]
 {¶ 31} Once a race-neutral explanation for the peremptory challenge has been offered and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether a prima facie showing has been made becomes moot.[7]
 {¶ 32} Whenever a party opposes a peremptory challenge by claiming racial discrimination, the duty of the trial court is to decide whether granting the strike will contaminate jury selection through unconstitutional means.[8] The inquiry, therefore, is whether the trial court's analysis of the contested peremptory strike was sufficient to preserve a constitutionally permissible jury-selection process.[9]
A trial court's finding of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous.[10]
The trial court, in supervising voir dire, is best equipped to resolve *Page 12 
discrimination claims in jury selection, because those issues turn largely on evaluations of credibility.[11]
 {¶ 33} Applying these principles to the facts of the instant case, we now address each potential juror excluded in light of the dictates ofBatson and its progenies.
 {¶ 34} At the conclusion of voir dire, when the State exercised its first peremptory challenge to strike Juror Coles, an African-American male, the following colloquy took place:
 "Mr. Cheselka: Can I inquire as to what grounds?
 The Court: Do you have a Batson challenge? Is that what you're doing?
 Mr. Cheselka: Yes.
 Ms. Ducoff: I don't think he can make a Batson challenge at this point. There's no pattern here. There's one — it's one peremptory.
 The Court: I don't think there needs to be a pattern.
 "* * *
 "The Court: Okay. Here, counsel. Review the law. It's race alone that triggers the inquiry. * * * And I think, based on that, juror number three is an African-American. The burden shifts to the prosecution for a non-pretextual explanation. And I would remind you the case law establishes that the non-pretextual explanation doesn't need to rise to the level of cause but.
 Ms. Ducoff: Are you telling me to respond now judge? *Page 13 
 The Court: Yes.
 Ms. Ducoff: Mr. — one thing that Mr. Coles said that I didn't like was when he said with a rape charge he would hold me to a higher standard when he initially answered that question. And although you indicate as to — asked him if he could follow the law, he then, you know, politely responded, yes, he would, but I'm going with his — the gut reaction that he gave when I first asked him the question.
 The Court: Counsel?
 Mr. Cheselka: Just for the record, Your Honor. He is the only African-American male on the panel. That's why I made the challenge. He's a grandfather. He baby-sits. He's retired. And as for values, didn't have a problem believing the child as a witness. Understood, the question was asked in the context of rape, candy bar, and his reaction of, yeah. You inquired, said, you've been given an instruction and did he have any problem whatsoever following the instructions of the Court. He said, no.
 The Court: Well, there doesn't seem to be any discriminatory intent within the explanation by the State, so your Batson would be overruled. He may be stricken."[12]
 {¶ 35} We have examined the voir dire examination of the prosecutor, including the above excerpt, and we see no evidence that the prosecutor exercised a peremptory challenge to exclude Mr. Coles, an African-American, because of his race. The record indicates that Mr. Coles stated that he would hold the State to a higher standard in a rape case as opposed to a case that involved a theft of a candy bar. Mr. Coles made the statement after the prosecutor had explained that the standard in a criminal case is the same regardless of the *Page 14 
crime charged. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason will be deemed race-neutral.[13]
 {¶ 36} The record also indicates that when the State exercised its second peremptory challenge to strike Juror Jackson, another African-American male, the following colloquy took place:
 "Mr. Cheselka: I will now at this point re-raise Batson, Your Honor.
 Ms. Ducoff: And I am happy to respond. This case involves an emergency room doctor from Hillcrest Hospital. Juror number 20 has had the worst experiences at Hillcrest Hospital, including the death of a child. So when Mr. Cheselka talks about some Parma administrative assistant has to remain neutral, I'd say that Mr. Jackson, for all the wonderful qualities he has other than that, does have a problem with Hillcrest Hospital. For that reason, he needs to be excluded."
 "* * *
 "Mr. Cheselka: And I will say for the record, there are only two African-American men in the panel, and they have both been eliminated.
 The Court: How many women?
 Ms. Ducoff: There are still African-American females on the panel.
 The Court: I'm aware of that. But your Batson challenge was on gender.
 Ms. Ducoff: My Batson — Mr. — *Page 15 
 The Court: Overruled."[14]
 {¶ 37} Again, after reviewing the above excerpt and the entire voir dire, we find no indication that the prosecutor exercised a second peremptory challenge to exclude Mr. Jackson, another African-American, because of his race. The record before us reveals that the prosecutor asked all the jurors about their experiences with Hillcrest and University Hospitals. Mr. Jackson stated that he had a very negative experience with Hillcrest Hospital. When asked to elaborate, Mr. Jackson stated that his mother had back surgery at Hillcrest after being told it would keep her out of a wheelchair, but despite the surgery, she still ended up in a wheelchair. Mr. Jackson also stated that his son died at Hillcrest Hospital.
 {¶ 38} Given that K.C. was treated at Hillcrest Hospital and there would be extensive testimony from the treating personnel, the prosecutor's explanation for striking Mr. Jackson, in light of his negative experience with the hospital, was race-neutral. Lastly, we must accord some deference to the trial court's finding that the prosecutor's explanation was persuasive and, consequently, the defendant had failed to carry his burden of proving that the prosecutor had engaged in purposeful discrimination.[15] Accordingly, we overrule the first assigned error.
 Right of Confrontation *Page 16 {¶ 39} In the second assigned error, Carlisle argues that the trial court erred when it barred him, pursuant to Ohio's Rape Shield Law, from presenting evidence that K.C. had also accused her brothers of committing the sexual abuse in this case. We disagree.
 {¶ 40} Initially, we note the admission or exclusion of relevant evidence rests within the sound discretion of the trial court.[16]
Therefore, we will not disturb a trial court's evidentiary ruling unless we find the ruling to be an abuse of discretion; that is, unreasonable, arbitrary or unconscionable and not merely an error of law or judgment.[17]
 {¶ 41} R.C. 2907.02(D)and (E) codifies Ohio's "rape shield" law. The statute renders inadmissible prior sexual conduct of a victim or a defendant and states, in relevant part:
 "(D) Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."
 {¶ 42} As cited above, the statute renders inadmissible prior sexual conduct of a victim unless it involves "evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender," and only to "the extent that the court finds *Page 17 
that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."[18]
 {¶ 43} A review of the record before us reveals that the instant assigned error flows from the State's motion seeking to redact certain statements contained within the University Hospital medical records. The State specifically sought to redact statements made by Carol Carlisle to a social worker at University Hospital alleging that K.C. had changed her story, and stated that she was touched by her brothers A.C., M.C., and J.C.
 {¶ 44} Since the statements the State sought to redact were statements made by Carol Carlisle to the social worker, about what K.C. allegedly told her, the trial court concluded the statements were inadmissible hearsay, if sought to be introduced by way of the medical records itself. We agree.
 {¶ 45} "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[19] A trial court's discretion to admit or exclude relevant evidence does not include the discretion to admit hearsay.[20] Evid. R. 802 mandates the exclusion of hearsay unless any *Page 18 
exceptions apply.[21] Evid. R. 803(4) provides a hearsay exception for "statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."[22] In the instant case, K.C.'s alleged statement that she was touched by her brothers A.C., M.C., and J.C. does not satisfy the medical diagnosis exception because K.C. was allegedly speaking to her foster-mother, not a medical provider. Thus, the trial court properly ruled that the statement was inadmissible hearsay.
 {¶ 46} The record indicates that the trial court then proceeded to review the rape shield law, defense counsel sought and obtained permission to brief the issue. However, the record indicates that defense counsel did not file a brief regarding the issue.
 {¶ 47} Nonetheless, Carlisle now argues that he was prevented from presenting evidence that K.C. had previously accused her brothers of sexual assault, or that someone else had committed the instant offense. We are not persuaded.
 {¶ 48} We have concluded that the statements were indeed hearsay and not admissible. The statements, even if made by K.C., referred to prior sexual activity of the victim, and not the activity covered by the instant case, and as such, would not fall within the Rape Shield *Page 19 
evidence exception set forth above, and would have been more inflammatory or prejudicial than probative.
 {¶ 49} There was no evidence presented at trial that anyone else, including Kh.C., abused K.C. on May 12, 2006. Further, defense counsel never pursued the theory that Kh.C. could have sexually assaulted K.C. on the day in question. It is undisputed from the record that Kh.C. and Carlisle were the only males present at the home when K.C. was assaulted. The evidence presented at trial established that the couple's disabled adult son accompanied his mother to visit her relatives and the other adult son was at work.
 {¶ 50} The evidence Carlisle now argues he was prevented from presenting would have been offered solely to impeach K.C.'s credibility. Ohio Rape Shield Law clearly prohibits such an impeachment technique by rendering inadmissible evidence of the victim's prior sexual activity when offered solely to impeach the victim's credibility.[23]
 {¶ 51} We conclude it was not an abuse of discretion for the trial court to grant the State's motion to redact the statements Carol Carlisle made to the social worker regarding K.C.'s accusations of her brothers. Accordingly, we overrule the second assigned error.
 Victim Impact Statements {¶ 52} In the third assigned error, Carlisle argues he was denied a fair trial due to the introduction of victim impact statements, specifically that K.C. had psychiatric difficulties well after the incident. We disagree. *Page 20 
 {¶ 53} Victim impact evidence is excluded because it is irrelevant and immaterial to the guilt or innocence of the accused; it principally serves to inflame the passion of the jury.[24] Nevertheless, the State is not wholly precluded from eliciting testimony from victims that touches on the impact the crime had on them: "circumstances of the victims are relevant to the crime as a whole. The victims cannot be separated from the crime."[25] In State v. Fautenberry, [26] the Supreme Court went on to say that "we find that evidence which depicts both the circumstances surrounding the commission of the murder and also the impact of the murder on the victim's family may be admissible during both the guilt and the sentencing phases."[27]
 {¶ 54} With these precedents in mind, we decline to conclude that Carlisle was denied a fair trial due to the introduction of victim impact evidence. The emotional scars of sexual abuse are as real as the physical scars caused by physical assaults.[28] Just as the victim of a felonious assault may testify to the treatment needed as a result of the assault in order to *Page 21 
prove that the assault actually did occur, so may the victim of a sexual assault testify to the lingering trauma suffered as a result of that abuse.[29]
 {¶ 55} At trial, Ameerah Board, a child therapist with Murtis Taylor Multi-Service Center, who began treating K.C. approximately six months after the allegations, testified that K.C. was diagnosed with adjustment disorder and anxiety. Board testified that as a result of the allegations of sexual assault, K.C. continued to suffer from nightmares and crying spells. We conclude that Board's testimony was relevant circumstantial evidence of the psychological changes in K.C. as a result of the sexual assault.[30] As such, this evidence was properly introduced. Accordingly, we overrule the third assigned error.
 Ineffective Assistance of Counsel {¶ 56} In the fourth assigned error, Carlisle argues he was denied the effective assistance of counsel. We disagree.
 {¶ 57} We review a claim of ineffective assistance of counsel under the two-part test set forth in Strickland v. Washington.[31] UnderStrickland, a reviewing court will not deem counsel's performance ineffective unless a defendant can show his lawyer's performance fell below an objective standard of reasonable representation and that prejudice arose from the *Page 22 
lawyer's deficient performance.[32] To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would have been different.[33] Judicial scrutiny of a lawyer's performance must be highly deferential.[34]
 {¶ 58} Carlisle argues that trial counsel was ineffective for failing to object to victim impact evidence that K.C. had psychiatric difficulties well after the incident. In the third assigned error, we concluded that this evidence was properly admitted. Further, we have previously rejected similar claims of ineffective assistance of counsel where trial counsel failed to object to alleged improper victim impact evidence.[35] Consequently, we reject Carlisle's assertions that trial counsel was ineffective for failing to object to the victim impact evidence.
 {¶ 59} Carlisle also argues that trial counsel was ineffective in the handling of the alleged rape shield evidence. We are not persuaded.
 {¶ 60} In the second assigned error, we concluded that there was no abuse of discretion when the trial court ruled that Carol Carlisle's statement to the social worker should be redacted. We also concluded that the statement implicated Ohio's Rape Shield *Page 23 
Law. We further concluded that the statements, even if made by K.C., referred to prior sexual activity of the victim, and not the activity covered by the instant case, and as such, would not fall within the Rape Shield evidence exception set forth above.
 {¶ 61} As previously noted, trial counsel sought and was given an opportunity to brief the issue, but ultimately chose not to. It appears that as a matter of trial strategy counsel chose to abandon the purported rape shield issue and introduce it by other means. During trial counsel's cross-examination of K.C., the following exchange took place:
 "Q. Do you remember the last time you talked to Grandma?
 A. Yes.
 Q. Do you remember what you told her?
 A. Yes.
 Q. Could you tell us what you told her?
 A. `Jack did something bad.'
 Q. Do you remember talking about this to anybody else?
 A. Yes.
 Q. And when you told people, who did you talk to?
 A. My auntie and the police and my doctor.
 Q. Okay. Anybody else after that?
 A. No.
 Q. Did you talk to anybody here about this? *Page 24 
 A. Yes.
 Q. Who?
 A. Ronni.
 Q. Ronni? And what did you talk about?
 A. What Jack did.
 Q. What did you say?
 A. That Jack did something that he is not supposed to do.
 "* * *
 Q. Okay. Have you ever watched TV with Kh.C. in that room before?
 A. Yes.
 Q. Do you play a lot with Kh.C.?
 A. Yes.
 Q. Do you ever play with Kh.C. up in his room in the attic?
 A. No.
 Q. Have you ever been up in Kh.C.'s room in the attic?
 A. Yes.
 Q. Have you ever been in the attic with Kh.C. when Alshi is not home?
 A. No.
 Q. Have you ever been alone in the house with Kh.C. —
 A. No. *Page 25 
 Q. — with Jack not there?
 A. No.
 "* * *
 Q. Okay. Do you remember talking about how you got on the bed?
 A. Yes.
 Q. Do you remember talking about Kh.C. pushing you on the bed?
 A. Yes.
 Q. Could you tell us about that?
 A. Yes.
 Q. Go ahead.
 A. Kh.C. pushed me on the bed for a reason because we were playing tag. But Jack was not in the room.
 Q. And did anybody tell you to say that?
 A. No.
 Q You were playing tag?
 A. Yes.
 Q. Did you play anything else in the room?
 A. Yes.
 Q. What did you play?
 A. Hide and go seek.
 Q. With Kh.C.? *Page 26 
 A. Yes.
 Q. And how do you play that game?
 A. You have to run to base and say, `One, two, three, stuck on me.'
 Q. Do you play that a lot?
 A. Yes.
 Q. Did Kh.C. leave the room after that?
 A. No."[36]
 {¶ 62} It is clear from the above excerpt that trial counsel attempted to weave into evidence testimony to support Carol Carlisle's claim that K.C. had subsequently changed her story. However, K.C.'s version remained consistent. The above excerpt also reveals trial counsel's attempt to weave into evidence the theory that Kh.C. may have been the perpetrator. This also was an attempt to support Carol's statement to the social worker that K.C. had previously accused her brothers of sexually assaulting her.
 {¶ 63} Actions of defense counsel which might be considered sound trial strategy, are to be presumed effective.[37] As such, we conclude that trial counsel was not ineffective in his handling of the purported rape shield issue. Accordingly, we overrule the fourth assigned error. *Page 27 
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. McMONAGLE, P.J., and ANN DYKE, J., CONCUR
[1] We refer to the children by their initials pursuant to this court's established policy not to disclose the names of children in cases involving sexual abuse.
[2] (1986), 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712.
[3] State v. Moore (1998), 81 Ohio St.3d 22, 28, 1998-Ohio-441, citing, State v. Hernandez (1992), 63 Ohio St.3d 577, 582, 589;State v. Hill (1995), 73 Ohio St.3d 433, 444-445, 1995-Ohio-287.
[4] Edmonson v. Leesville Concrete Co., Inc. (1991), 500 U.S. 614,114 L. Ed.2d 660, 111 S.Ct. 2077.
[5] Hill, supra, at 445.
[6] Batson, supra, at 97-98.
[7] State v. Hernandez, supra, at 583, citing Hernandez v. NewYork (1991), 500 U.S. 352, 114 L.Ed.2d 395, 111 S.Ct. 1859.
[8] Hicks v. Westinghouse Materials Co. (1997), 78 Ohio St.3d 95, 99,1997-Ohio-227.
[9] Id.
[10] Hernandez, 63 Ohio St.3d at 583.
[11] Hicks, supra, at 102, citing, Batson at 98.
[12] Tr. at 165-168.
[13] Purkett v. Elem, (1995), 514 U.S. 765, 131 L.Ed. 2d 834,115 S.Ct. 1769 (1995).
[14] Tr. at 173-174.
[15] State v. Brown, 2nd Dist. No. C.A. Case No. 19236, 2003-Ohio-2683.
[16] State v. Sage (1987), 31 Ohio St.3d 173.
[17] State v. Adams (1980), 62 Ohio St.2d 151.
[18] State v. Blayney, 5thDist. No. 06CA29,2008-Ohio-42.
[19] Estate of Holman v. Kates, Cuyahoga App. No. 88562,2007-Ohio-3778. See Evid. R. 801(C).
[20] In re Lane, 4thDist. No. 02CA61, 2003-Ohio-3755.
[21] State v. Barney (June 7, 1999), 4thDist. No. 97CA12 .
[22] State v. Wilson (Feb. 18, 2000), 4thDist. No. 99CA672.
[23] State v. Ferguson (1983), 5 Ohio St.3d 160.
[24] See State v. White (1968), 15 Ohio St.2d 146.
[25] State v. Williams, 99 Ohio St.3d 439, 2003-Ohio-4164, P43, quoting State v. Lorraine (1993), 66 Ohio St.3d 414, 420.
[26] 72 Ohio St.3d 435, 439-440, 1995-Ohio-209, certiorari denied,516 U.S. 996, 133 L.Ed. 2d 439, 116 S.Ct. 534.
[27] Id.
[28] State v. Gus, Cuyahoga App. No. 85591, 2005-Ohio-6717.
[29] Id.
[30] State v. Blackman, Cuyahoga App. No. 88608, 2007-Ohio-4168.
[31] (1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052.
[32] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph one of syllabus.
[33] Id. at paragraph two of syllabus.
[34] State v. Sallie (1998), 81 Ohio St.3d 673, 674.
[35] See State v. Eads, Cuyahoga App. No. 87636, 2007-Ohio-539.
[36] Tr. at 243-247.
[37] State v. Rodgers, 6th Dist. No. L-02-1089,2004-Ohio-3795 citing Strickland, supra, at 687. *Page 1