Filed 7/29/15  P. v. Sparks CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C073787 |
| v. | (Super. Ct. No. 12F02275) |
| LASHAWN SPARKS, | |
| Defendant and Appellant. | |

A jury convicted defendant Lashawn Sparks of first degree robbery (Pen. Code, § 211) and the trial court found he had been convicted of a prior strike (§ 667, subds. (b)-(i)).[1]  The trial court sentenced defendant to serve eight years in prison.  At the same

---

[1]  Undesignated statutory references are to the Penal Code.

time, the court sentenced defendant to serve a concurrent four years for violation of probation in Sacramento County Superior Court case No. 10F03541.

On appeal, defendant contends (1) the pretrial identification procedure was impermissibly suggestive that he was one of the robbers, and (2) the trial court erred in denying his *Batson/Wheeler* motion.[2]

We conclude the police did not employ an impermissibly suggestive pretrial identification procedure. And, we agree with the trial court that defendant did not make a prima facie showing of race-based discrimination by the prosecutor. Accordingly, we affirm.

FACTUAL AND PROCEDURAL HISTORY

### *Prosecution Evidence*

On the afternoon of January 25, 2012, Francisco Navarro was riding on the light rail in Sacramento when a group of six African-American men boarded the train. One of the men, later identified as defendant, sat down next to Navarro. Navarro observed him to be approximately five feet, six inches tall, and wearing a blue long sleeve shirt with a checkered pattern. As defendant asked Navarro random questions, Navarro became nervous. When defendant began raising his voice, Navarro stood up to leave. Defendant told Navarro to be calm and sit down if he knew what was "good for [him]."

One of the men who boarded with defendant came over and sat down near to Navarro. This man was approximately six feet, two inches tall, and he wore a black

---

[2]    *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), disapproved on another ground in *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*).

hooded sweater. Defendant asked if Navarro had anything in his pockets before instructing Navarro to empty them out. As the taller man laughed and reached into his clothing, defendant told Navarro his associate had a gun. Defendant then told Navarro he would punch Navarro in the face if he did not empty his pockets. Navarro handed over his iPod and cell phone. Defendant asked whether that was all Navarro had before telling him to get off the train. Navarro got off at the next stop. After walking to a relative's house, Navarro had an uncle call the police. Navarro's uncle initiated the call and handed the phone to Navarro to provide a description of defendant.

On February 22, 2012, Navarro met with City of Sacramento Police Officer Edwin Asahara. Officer Asahara showed Navarro several still photographs taken from a surveillance camera on the light rail train. Officer Asahara told Navarro to be honest with him and not to accuse anyone if Navarro was uncertain. Navarro studied the photos for three to five minutes and told Officer Asahara the people in the photos were the ones who robbed him. The still photos showed defendant wearing the checkered pattern shirt described by Navarro during the 911 call. Navarro also identified the taller man who participated in the robbery. Navarro wrote brief notes on the circumstances of the robbery next to the photos.

On March 6, 2012, Officer Asahara met with Navarro again and showed him a photo lineup with six photos of African-American men. Officer Asahara gave Navarro a standard admonishment. Within seconds, Navarro picked out defendant's photo as that of the robber.

The jury was shown the surveillance video from the train, photos from the surveillance video, and the photo lineup.

At some point during the investigation, Officer Asahara questioned defendant. Defendant admitted he was on the train during the robbery and he was in the still photos.

3

However, defendant denied sitting next to or robbing Navarro. Instead, defendant gave Officer Asahara the telephone number of Ralo, the person defendant asserted was the robber. When the officer dialed the number, a male answered but refused to give information or meet with Officer Asahara in person.

## *Defense Evidence*

The defense theory of the case was that defendant had been mistakenly identified as Navarro's robber. The defense introduced the testimony of Dr. Geoffrey Loftus, a professor in the Department of Psychology at the University of Washington. Dr. Loftus explained people sometimes form and re-form memories that do not accurately reflect the event to which the memory pertains.

## DISCUSSION

## I

### *Pretrial Identification*

Defendant contends his due process rights were violated because the pretrial identification procedures used by the police were impermissibly suggestive. We disagree.

### A.

### *Motion to Exclude the Photo Lineup*

Before the start of trial, the defense moved to exclude Navarro's photo lineup identification of defendant. The defense argued the identification of defendant in the photo lineup was unduly suggestive because it occurred after Officer Asahara showed photos of defendant to Navarro. The trial court denied the motion, explaining:

"[I]n this case, I find that the defense has not met [its] burden to show that it was suggestive or unfair.

4

"The circumstances in our case are clear that the witness gave -- within 30 minutes of the incident gave a description of the person who was involved in the robbery, that is the person [defendant], that closely matched him at least with regard to his clothing, his age, his race.

"And what's particularly important to the Court is that he differentiated. So he was able to say there were two different people involved, but he differentiated between the person when he spoke and the person who possibly had a gun. Indicated differences in height.

"And then when the officer showed the tape, he did not just show . . . a single person. Defendant['s] Exhibits C and D both show that he was actually shown a group -- especially in Defendant's D, a group of four possible African-American males.

"And that the defendant was sort of in the middle of that group. And that he was able to not only identify the defendant as being the one who -- who spoke, but also differentiate and indicate another person as being the one who -- who spoke but also differentiate and indicate another person as being the one who possibly had the gun.

"And so clearly, it appeared the witness was able to -- was not being led to unfair or suggestive identification based upon that.

"And that there are also corroborative factors, which is that the defendant admits to being on the train at the time of the robbery.

"And so the -- the real identification issue is whether or not the defendant was the one involved in the robbery as opposed to being present.

"I think all of these factors together have made it difficult . . . for the defense to meet [its] burden in this case, and I find that [it] did not meet [its] burden.

5

"Ultimately, the victim was able to pick out of a group of six, identify the defendant out of a six-pack lineup that the defendant was one of those involved in the robbery, and that specifically he was the one who did not have the gun.

"So under all those circumstances, defense motion is denied to exclude the I.D. and lineup."

At trial, Navarro was unable to positively identify defendant as the robber. Navarro testified defendant's skin appeared slightly lighter and his hair looked different. However, Navarro and Officer Asahara testified about the prior identifications made with the photo lineup and surveillance camera photos.

## B.

### *Exclusion of Identification Testimony*

A motion to exclude an out-of-court identification on due process grounds requires the trial court to consider " '(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances.' (*People v. Carpenter* (1997) 15 Cal.4th 312, 366–367.) The first prong of the test requires the court to consider ' "whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him [or her]." ' " (*People v. Yeoman* (2003) 31 Cal.4th 93, 124, quoting *People v. Carpenter* (1997) 15 Cal.4th 312, 367.) Defendant bears the burden of demonstrating the identification procedure was unduly suggestive. (*People v. Avila* (2009) 46 Cal.4th 680, 700.)

## C.

### *Surveillance Video and Photo Lineup Evidence*

Defendant's argument casts the use of photos from the surveillance video as unduly suggestive for the subsequent photo lineup. We reject the argument. Here, the

6

police retrieved the surveillance video taken by the light rail train camera based on a description of the robbery and the perpetrators given by Navarro shortly after the incident. Navarro's description of the robber's height, clothing, approximate age, and race were confirmed by the photos from surveillance video -- rather than prompted by them. Navarro, and later defendant, confirmed the surveillance video was accurate and showed defendant on the train. There was no error in showing the video to Navarro. (*People v. Ingle* (1986) 178 Cal.App.3d 505, 513 (*Ingle*).)

*Ingle* involved a challenge to a photo lineup in which the witness identified the robber after having seen a videotape of the robbery in progress. (*People v. Ingle, supra*, 178 Cal.App.3d at pp. 511-512.) The *Ingle* court rejected the contention that the videotape viewing was unduly suggestive for a subsequent identification, noting that "[i]t is now clearly established that lay opinion testimony concerning the identity of a robber portrayed in a surveillance camera photo of a robbery is admissible where the witness has personal knowledge of the defendant's appearance at or before the time the photo was taken and his [or her] testimony aids the trier of fact in determining the crucial identity issue." (*Id.* at p. 513.)

Officer Asahara did not create an unduly suggestive identification procedure by showing Navarro the surveillance camera photos before Navarro identified defendant from the photo lineup. Navarro interacted with and observed defendant during the robbery. Navarro was able to give a detailed description of defendant to the police shortly after the incident. And his description of defendant's height, clothing, appearance, and approximate age did not change. The record discloses no way in which Navarro was influenced to change his identification of defendant or description of the robbery by the surveillance camera photos.

Moreover, we reject the contention the surveillance camera photos themselves somehow tainted the subsequent photo lineup. As *Ingle* explains, "The camera is not subject to the frailties of the human condition. It has no bias, motive, intent or emotional response with respect to events that it views. Its memory is not affected by intervening life experiences that intrude between its initial recording of an event and a later viewing of the picture it has captured on tape. While it has its own limited perspective and while the quality of its product is variously affected by the circumstances under which it operates, the imperfections and distortions are in the normal case readily perceived and understood. In short, unlike the recollections and descriptions of a human witness, the recorded memory of the video surveillance camera has little serious potential to mislead. Indeed, its opposite potential to correct and enhance the reliability of an eyewitness identification in cases like the present would appear greater than its potential to cause an incorrect result. Accordingly, we find nothing inherent in the procedure with which we deal in this case that can be said to be unnecessarily suggestive and conducive to irreparable mistaken identification." (*People v. Ingle, supra*, 178 Cal.App.3d at p. 513.)

Further, the photo lineup itself was not unduly suggestive. Each of the six photos in the photo lineup is the same size and shows an African-American male of approximately the same age. Nothing in the dress, expression, or framing of the photographs in the lineup suggests or highlights defendant. Notably, in the photo lineup, defendant is not dressed in the clothing shown in the surveillance video from the light rail train.

In short, defendant has not shown the pretrial identification procedure used here was unduly suggestive.

## II

### *Batson/Wheeler*

Defendant, who is African-American, contends the trial court erred in denying his *Batson/Wheeler* motion based on the prosecution's use of a peremptory challenge against a prospective juror who is also African-American.  We disagree.

### A.

### *Prospective Juror No. 18*

During voir dire, the trial court questioned juror No. 18.  Juror No. 18 is African-American.  The trial court's questioning revealed juror No. 18 keeps to himself.  Juror No. 18 stated he is not married, does not have children, has not served in the military, does not know anyone in law enforcement, has not been the victim of a crime or ever known anyone who has been the victim of a crime, has never been arrested, does not have a job, and had no prior jury service.

The trial court seemed to indicate the youth of juror No. 18 when stating, "You don't have a lot of life experience up to this point . . . ."  The court also seemed concerned about juror No. 18's ability to deliberate and decide when the court inquired, "I'm wondering what happens when you're in a jury room and you got 11 other people and some of these people have had a lot of life experience.  No offense.  [¶]  But can you hold your own against them?"  Juror No. 18 answered, "I have my own opinion."  When asked whether he had any concerns about serving on the jury, juror No. 18 responded:  "Not really."  Finally, juror No. 18 answered that he could be a fair and impartial juror.

To a question by the prosecution about how juror No. 18 felt about the concept of reasonable doubt, he answered:  "I mean, I feel like, uh, it's -- I don't know."  He

subsequently expressed confidence in the concept.  On further questioning, juror No. 18 stated he could speak his mind even to people older than himself.

The prosecution exercised a peremptory challenge to excuse juror No. 18.  In response, defendant's trial attorney informed the trial court:  "I have begun, out of [an] abundance of caution whenever there is even the first challenge to a juror of the same nationality or race as my client, raising the Batson-Wheeler objection."  Defense counsel elaborated:  "And in this -- this particular instance, [juror No. 18] indicated he had background -- he had no background or connection to anything crime or criminal related or know anyone -- knew anyone with any sort of I guess in my mind objectionable qualities, particularly from a D.A.'s p[er]spective."

The trial court noted defendant and the stricken juror are both African-American men.  When the prosecutor was asked whether he wanted to address the issue, the prosecutor inquired whether the trial court found a prima facie showing of discriminatory peremptory challenge had been made.  The court responded, "I do not find that a prima facie case has been made."  The prosecutor declined to comment, and the trial court denied the *Batson/Wheeler* motion.  In denying the motion, the court noted at least two African-American jurors remained on the panel even while the prosecution had unexercised peremptory challenges.

### B.

### *The Batson/Wheeler Test*

The United States and California Constitutions prohibit the use of race-based peremptory challenges against prospective jurors.  (*Batson, supra*, 476 U.S. at p. 97; *Wheeler, supra*, 22 Cal.3d at pp. 276–277.)  In assessing whether there has been impermissible use of a peremptory challenge of a prospective juror, the courts have developed a three-part test.  "First, the defendant must make out a prima facie case 'by

showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [*Batson, supra,*] 476 U.S., at 93-94 (citing *Washington v. Davis*, 426 U.S. 229, 239-242, 48 L.Ed.2d 597 (1976).)" (*Johnson*, *supra*, 545 U.S. at p. 168.) This means that " 'the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.' " (*Id.* at p. 169, quoting *Batson, supra,* 476 U.S. at 96.) And, as *Johnson* notes, "An 'inference' is generally understood to be a 'conclusion reached by considering other facts and deducing a logical consequence from them.' Black's Law Dictionary 781 (7th ed.1999)." (*Johnson*, *supra*, at p. 168, fn. 4.)

If the defendant has made a prima facie showing, for the second prong of the test the " 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [(]476 U.S., at 94; see also *Alexander v. Louisiana*, 405 U.S. 625, 632, 31 L.Ed.2d 536 (1972).[)] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' *Purkett v. Elem*, 514 U.S. 765, 767, 131 L.Ed.2d 834 (1995) (per curiam)." (*Johnson*, *supra*, 545 U.S. at p. 168, fns. omitted.)

When a defendant challenges the denial of a *Batson/Wheeler* motion for which the trial court found no prima facie showing was made, we consider the record of the voir dire with "considerable deference" to determine whether the evidence supports the court's ruling. (*People v. Battle* (2011) 198 Cal.App.4th 50, 60.) We affirm if the record "suggests grounds upon which the prosecutor might have reasonably challenged" the dismissed juror. (*Ibid.*)

11

## C.

### *Analysis*

Reviewing the record with considerable deference to the trial court, we conclude defendant's trial attorney did not make a prima facie showing of a race-based peremptory challenge of juror No. 18. At the outset of our analysis, we note defense counsel did not make her *Batson/Wheeler* motion on the basis of any observation or feeling the prosecution was engaging in purposeful discrimination. Instead, defense counsel stated on the record she made the motion simply because it had become her practice to do so where the excused prospective juror shared the same race as the defendant. This was not a prima facie showing. It was a routine that did not reveal anything about the circumstances of this case.

Although defense counsel later added juror No. 18 said nothing she perceived as objectionable to the prosecution's side, the absence of a demonstrably problematic answer does not show a race-based peremptory challenge. Rather than demonstrating a lack of problematic answers, the transcript of juror No. 18's answers indicates a notable detachment from others in his lack of a job, indication of any relationships with family or friends, connection with anyone who has ever been the victim of a crime or belonged to law enforcement, or any indication of any social interaction. The lack of social contact or relationships appeared to raise some concern with the trial court, which questioned juror No. 18 as to whether he could deliberate and hold an opinion in the face of disagreement with others. The prosecution could well have concluded juror No. 18 lacked sufficient life experience to properly deliberate in this case. On this record, the trial court correctly found the defense had not made a prima facie showing of purposeful discrimination in the prosecution's use of a peremptory challenge against juror No. 18.

12

DISPOSITION

The judgment is affirmed.

_____HOCH_____, J.

We concur:

_NICHOLSON_, Acting P. J.

_____DUARTE_____, J.

13